# EXHIBIT 4

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL    Document 994    Entered on FLSD Docket 01/27/2024    Page 1 of 180    1
2 of 104

1
2
3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION
CASE NO. 22-CR-80022-CANNON

4      UNITED STATES OF AMERICA,

5                         Plaintiff,                  September 29, 2023

6              vs.                              Fort Pierce, Florida

7      JOSE GOYOS,

8

9                         Defendant.

10      _____/

11                         PAGES 1-180

12                      AFTERNOON SESSION
                   TRANSCRIPT OF JURY TRIAL
13            BEFORE THE HONORABLE AILEEN M. CANNON
                  UNITED STATES DISTRICT JUDGE

14

15      APPEARANCES:

16      FOR THE GOVERNMENT:          PATRICK QUEENAN, AUSA
                                     REGINALD CUYLER, AUSA
17                                   ANDREW TAMAYO, AUSA

18      FOR DEFENDANT GOYOS:         ROBERT ADLER, AFPD
                                     M.CAROLINE McCRAE, AFPD
19

20

21      Official Court Reporter:    Pauline A. Stipes
                                    West Palm Beach/Ft. Pierce
22                                  561-803-3434
                                    HON. ROBIN L. ROSENBERG
23

24

25

**Pauline A. Stipes, Official Federal Reporter**

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
2 of 504
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 2 of 180   2

1                              INDEX

2           WITNESSES:

3           ETHAN MACIER

4           Cross-Examination by Mr. Adler          Page 4

5           Redirect Examination by Mr. Cuyler      Page 20

6           WILBUR MARTIN

7           Direct Examination by Mr. Cuyler        Page 27

8           DANIEL CARVER

9           Direct Examination by Mr. Queenan       Page 39

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              If you could stand up for a moment to be sworn in.
 2              DANIEL CARVER, GOVERNMNET'S WITNESS, SWORN
 3          THE COURT:  If you could please be seated.  Tell us
 4   your full name and spell your last name.
 5          THE WITNESS:  My name is Daniel Michael Carver,
 6   C-A-R-V-E-R.
 7          MR. QUEENAN:  The Government does call Daniel Michael
 8   Carver.
 9                     DIRECT EXAMINATION
10   BY MR. QUEENAN:
11   Q.  Mr. Carver, Ms. Pauline is taking down everything, so if
12   you could talk into the microphone and speak slowly and audibly
13   so we can hear you.  Okay?
14   A.  Okay.
15   Q.  Please be careful, don't hit the mike.
16       Where do you reside?
17   A.  I reside in Port St. Lucie County Jail.
18   Q.  Would you say that one more time?
19   A.  In the Port St. Lucie County Jail.
20   Q.  Are you incarcerated for your role in this case?
21   A.  Yes, sir.
22   Q.  How long have you been in jail?
23   A.  19 months, sir.
24   Q.  Do you know Jose Goyos?
25   A.  I do.
```

1  *Q.*  **How do you know him?**

2  *A.*  **He was a friend of mine and also worked for me.**

3  *Q.*  **Do you see him in the court today?**

4  *A.*  **I do, sir.**

5  *Q.*  **Please point him out and describe an article of clothing he**

6  **is wearing?**

7  *A.*  **He is sitting right there with a red tie and black jacket.**

8       *MR. QUEENAN:*  **May the record reflect the witness has**

9  **identified Jose Goyos?**

10      *THE COURT:*  **The record reflects the identification.**

11      *MR. QUEENAN:*  **Thank you.**

12  *BY MR. QUEENAN:*

13  *Q.*  **Did you own and operate call centers from January 2020 to**

14  **July 2021?**

15  *A.*  **Yes, sir.**

16  *Q.*  **Did Mr. Goyos work at those call centers around late May,**

17  **early June 2020?**

18  *A.*  **Yes, sir.**

19  *Q.*  **What was the name of the business that you used to operate**

20  **the center?**

21  *A.*  **Broad Street Lifestyles, Olympus First Marketing, and the**

22  **DMC Group.**

23  *Q.*  **Who did you partner with in running those call centers?**

24  *A.*  **Thomas Dougherty and John Paul Gosney, and that is it.**

25  *Q.*  **Did you eventually have other partners down the line?**

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 41 of 180

11

```
 1    A.   I did.

 2    Q.   And who were they?

 3    A.   Michael and Galina Rosenberg, Julio Chavez, John Chapton

 4    (phon), my brother, Louis Carver, and I believe that is it.

 5    Q.   How did the call centers make money?

 6    A.   Well, at first we would get doctor's orders or requisition

 7    information for different medical testings and medical

 8    equipment, and we would send them to laboratories or medical

 9    equipment companies that billed Medicare Part B, and eventually

10    we owned and operated the laboratories as well and billed

11    Medicare as well.

12    Q.   Two ways?

13    A.   Yes.

14    Q.   How were you actually making money?  What were you selling?

15    What were you exchanging?

16    A.   We were selling doctors' orders or signed genetic

17    information --

18    Q.   Who would pay you for the signed doctors' orders?

19    A.   Either durable medical owners, DME's, or laboratories.

20    Q.   Did Mr. Goyos work for you at the call center?

21    A.   Yes, he did.

22    Q.   What roles did he have at the call center?

23    A.   He was a manager for us for our laboratory process,

24    campaign.  He would triage doctors' orders or requisition

25    information as well as he ran the Doctor Chase department which
```

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
7 of 104
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 42 of 180

12

 1   got signatures from doctors.

 2   Q.  And we are going to talk about both of those functions in a

 3   moment --

 4        MS. McCRAE:  Your Honor, I am having a hard time

 5   hearing Mr. Queenan.

 6        MR. QUEENAN:  Sorry about that.

 7   BY MR. QUEENAN:

 8   Q.  You said triage --

 9        THE COURT:  Ms. McCrae, maybe you want to take a seat

10   up over here.

11        MS. McCRAE:  He moved up the lapel mike and I can hear

12   it.  Thank you.

13        THE COURT:  Okay.

14   BY MR. QUEENAN:

15   Q.  You mentioned triage.  What would that mean?

16   A.  He would put orders into our CRM, which is our -- like our

17   server, our computer for the doctor's orders or the requisition

18   information.

19   Q.  Did that job involve falsifying records?

20   A.  It did, yes.

21   Q.  Did you also own and manage laboratories enrolled in

22   Medicare?

23   A.  We did.  Yes, we did.

24   Q.  Who did you partner with in owning those laboratories?

25   A.  Thomas Dougherty, John Paul Gosney, Julio Chavez, my

 1   brother, Louis Carver, Michael and Galina Rosenberg, and Jamie

 2   McNamara.

 3   Q.  Briefly, how did the laboratories make money?

 4   A.  We would bill Medicare Part B for genetic test for the CGX

 5   cancer campaign or the cardio heart campaign.

 6   Q.  Where did the doctor's orders come from that you would use

 7   to bill Medicare?

 8   A.  We would generate it in our call center, and we would -- it

 9   would start from our call center for Broad Street or Olympus

10   first, and eventually come to -- you know, go to the lab part,

11   the back end.

12   Q.  Are these real laboratories?

13   A.  No.  They are not.

14   Q.  What are they?

15   A.  They are shell laboratories, the bare minimum requirements

16   that Medicare needs to be able to bill Medicare.  So it would

17   be a small office with a couch and microwave, we called it a

18   shell lab.

19   Q.  Was there equipment in the laboratories?

20   A.  No, there was not.

21   Q.  Was there a full-time staff and lab workers in these

22   laboratories?

23   A.  No, there was not.

24   Q.  Did your laboratories run a single test?

25   A.  No, it did not.

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 44 of 180 14
9 of 104

1    Q.   Now, you said you owned those.  Did you disclose to

2    Medicare that you were the owner and manager of those

3    laboratories?

4    A.   No.  We did not disclose that we were the owners or

5    managers of those laboratories.

6    Q.   Why not?

7    A.   We were felons, that was the most important thing.  We

8    could not let them know myself or any of my partners had any

9    type of felony on our record.

10   Q.   Did you lie to Medicare?

11   A.   We did, yes.

12   Q.   Why?

13   A.   Because we were felons, we wanted to bill and make money.

14   Q.   Was Mr. Goyos aware you were a felon?

15   A.   He was, yes.

16   Q.   Did you ever inform him that you concealed ownership of the

17   labs to Medicare?

18   A.   Yes, we did.

19   Q.   If you were not listed as owners of the lab, who did you

20   list?

21   A.   We listed a straw owner or fall guy.  I listed my brother

22   to be one as well as other non-convicted felons that we could

23   trust.

24   Q.   So, during this time period, January 2020 through

25   July 2021, approximately how much did you bill Medicare for

```
 1    genetic testing using these three laboratories -- or these

 2    laboratories, rather?

 3    A.  I think just under $70 million, give or take.

 4    Q.  Which laboratories are you talking about?

 5    A.  Cergena Laboratory, Progenix laboratory, Theragene

 6    Laboratory, Signify Laboratory.

 7    Q.  Did you sell doctors' orders to another laboratory?

 8    A.  We did, yes.

 9    Q.  What is the name of that laboratory?

10    A.  That was Signify.  We sold to Signify first and eventually

11    we obtained Signify.

12    Q.  Did you also sell to a laboratory located in Colorado?

13    A.  We did, yes.

14    Q.  What was the name of that laboratory?

15    A.  I believe Theses Laboratory.

16    Q.  And Claro Laboratory?

17    A.  Claro Laboratory, yes.

18    Q.  The under $70 million you referred to, that is for which

19    labs?

20    A.  Cergena, Progenix, Signify, as well as Claro and Theses.

21    Q.  During this time period, approximately how much money did

22    you profit?

23    A.  Just around $10 million.  Maybe a little under.

24    Q.  Now, just jumping back to the straw owners, your brother

25    was one of them?
```

Pauline A. Stipes, Official Federal Reporter

```
 1   A.   Yes, he was.

 2   Q.   Which lab was he listed for?

 3   A.   He was on Cergena, and we were trying to put him on another

 4   one as well.

 5   Q.   What do you mean, you were trying to?

 6   A.   We were going to put another straw owner other a again and

 7   they came back and told us that he was a convicted felon in

 8   juvenile days, they did not want to risk for us to bill

 9   Medicare.  We were going to put my brother on it, Louis Carver.

10   Q.   That person you were going to put on, was that Ethan

11   Macier?

12   A.   Yes.

13   Q.   Was Mr. Goyos aware that you used your brother as a straw

14   owner?

15   A.   Yes, he was.

16   Q.   How do you know?

17   A.   I told him, he was my friend, and also he was a friend of

18   our family, so he was aware.

19   Q.   Was Mr. Goyos aware that you were using these labs to bill

20   Medicare?

21   A.   Yes, he was.

22   Q.   How do you know that?

23   A.   Because the only patients that we dealt with were Medicare

24   Part B recipients, over 65 years old, and also I told him

25   before.
```

Pauline A. Stipes, Official Federal Reporter

 1   *Q.*  Did you pay Mr. Goyos a salary?

 2   *A.*  I did, yes.

 3   *Q.*  Is that something you paid by pay check or payroll?

 4   *A.*  Yes, we paid it by paycheck, and also I have given him cash

 5   before as well.

 6   *Q.*  Did you give him bonuses?

 7   *A.*  Yes.

 8   *Q.*  Did you give him cash bonuses?

 9   *A.*  I did, yes.

10   *Q.*  How frequent were the cash bonuses?

11   *A.*  There were a lot of times we gave cash bonuses.  I don't

12   remember off the top of my head.

13   *Q.*  What is a lot, once a month?

14   *A.*  Once a month, sometimes twice a month, sometimes we would

15   skip a month, but very frequent.

16   *Q.*  What was the amount of cash bonuses you were giving?

17   *A.*  For bonuses, up to $10,000 a month per manager, sometimes

18   $5,000, sometimes ten grand.  It could be in between five and

19   $10,000.

20   *Q.*  Did you hand Mr. Goyos five or $10,000 of cash for his work

21   at the call center?

22   *A.*  I did, yes.

23   *Q.*  How did you hand it to him?

24   *A.*  In an envelope.

25   *Q.*  Did you purchase Mr. Goyos gifts for being a manager at the

```
 1   call center?

 2   A.  I did, yes.

 3   Q.  Anything you recall specifically?

 4   A.  Yes, I gave him a Cartier luxury watch for Christmas, we

 5   have bought him many designer clothes, I helped him purchase

 6   his BMW X6, and airfares to different locations, luxury hotels,

 7   stuff like that.

 8   Q.  Now, you told us you are incarcerated for your role in this

 9   case.  Did alpha you plead guilty to a crime related to these

10   call centers?

11   A.  Yes, I did.

12   Q.  Which crimes did you plead guilty to?

13   A.  I believe health care fraud, or conspiracy to commit health

14   care fraud, and conspiracy to the antikickback statute.

15   Q.  Two separate crimes?

16   A.  Yes, sir.

17   Q.  What did you do wrong?

18   A.  Well, I mean, you know, I -- we broke many laws billing

19   Medicare, we forged doctors' orders.  I was the owner and

20   operator of this whole entire business.  I committed -- what

21   they charged me with I did, which was bribing doctors, which

22   was antikickback statute and lying to Medicare and illegally

23   billing Medicare.

24   Q.  Did your call centers lie to patients?

25   A.  We did.
```

```
 1   Q.   Thousands of patients?

 2   A.   Yes.

 3   Q.   Did you lie to doctors?

 4   A.   Yes.

 5   Q.   Thousands of doctors?

 6   A.   Thousands of doctors.

 7   Q.   How many calls do you think the call center made in the 18

 8   or 19 months?

 9   A.   At least a half million plus, if not more.

10   Q.   Now, did you sign a plea agreement with the Government?

11   A.   Yes, I did.

12   Q.   Being here today is an obligation under your plea

13   agreement?

14   A.   Yes, sir.

15   Q.   What is the only job you have today?

16   A.   To tell the truth.

17   Q.   What happens if you don't tell the truth?

18   A.   Well, I mean, my plea agreement could be ripped up, I can

19   get charged with a new crime, get more time in prison.

20   Q.   With regard to the crimes that you plead guilty to, have

21   you been sentenced?

22   A.   I have not, no, sir.

23   Q.   Are you testifying in hopes to get a reduction in your

24   sentence?

25   A.   I am, sir, yes.
```

```
 1    Q.  Who ultimately decides whether or not your sentence will be
 2    reduced?
 3    A.  The judge, sir.
 4    Q.  Before that, though, does the Government have to move to
 5    ask the Court to consider the request for reduction?
 6    A.  I believe so, yes, sir.
 7    Q.  Now, where are you originally from?
 8    A.  Brooklyn, New York.
 9    Q.  At some point did you relocate to South Florida?
10    A.  Yes, I did.
11    Q.  When was that?
12    A.  When I was four years old.
13    Q.  Can you describe for the jury what your educational
14    background is?
15    A.  I have a GED in high school.
16    Q.  Did you drop out of high school?
17    A.  I did, yes, sir.
18    Q.  How old are you right now?
19    A.  I am 37.
20    Q.  So, in 2020, how old were you?
21    A.  34.
22    Q.  So, during these crimes you were 34, 35 years old; is that
23    fair?
24    A.  Yes, sir.
25    Q.  Prior to Broad Street, had you worked in call centers?
```

```
 1   A.   I have, sir, yes.

 2   Q.   When did you start working in call centers?

 3   A.   Like 2004, 2005.

 4   Q.   So, 15 or 16 years leading into 2020?

 5   A.   Yes, sir.

 6   Q.   What types of campaigns were part of that call center?

 7   A.   I did everything from sell alarm systems to different types

 8   of cable, Comcast, debt settlement, you know, obviously, I did

 9   medical lists, what we were doing now, Google listings, stuff

10   of that nature.

11   Q.   When you started off, were you doing the Comcast and

12   security systems?

13   A.   Yes, when I first doing call centers, it was for tangible

14   products, ADT alarm systems, Comcast, stuff like that.

15   Q.   Were you an actual telemarketer?

16   A.   I was, yes.

17   Q.   When you called, did you give them your real name?

18   A.   Yes, I did.

19   Q.   Did you tell them where you were calling from?

20   A.   Yes, I did.

21   Q.   Did you disclose the purpose of the call?

22   A.   Of course, yes.

23   Q.   As you went along, though, did that change?

24   A.   It did.  When I started owning and operating call centers,

25   it changed, yes.  Different campaigns.
```

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 52 of 180

17 of 104
52

```
 1   Q.  For lack of a better term, did it get a little dirtier?

 2   A.  Yes, it did, unfortunately.

 3   Q.  In fact, along the way, were you investigated by the

 4   Federal Trade Commission for one of the call centers?

 5   A.  Yes, that was in 2018, I believe.

 6   Q.  Did you arrive at a settlement with that agency?

 7   A.  Yes, I did.

 8   Q.  What campaign was that?

 9   A.  It was for Google, contact different business owners and

10   offer to help them with the Google listing.

11   Q.  Did you keep call centers after that incident?

12   A.  I did.  Yes.

13   Q.  You told the jury that you pled guilty in this case and you

14   said you were a felon.

15       I want to be clear, were you a felon before you pled in

16   this case?

17   A.  I was, yes.

18   Q.  You had been a felon how long?

19   A.  Since 2006, 2007.

20   Q.  Do you have multiple previous felony convictions for drugs,

21   assault and theft offenses?

22   A.  Yes, I do.

23   Q.  Over the years, have you had drug addiction issues?

24   A.  I have, yes.

25   Q.  What types of drugs?
```

1    *A.*  Opioids, heroin, cocaine, alcohol, marijuana, Xanex,

2    prescription pills.

3    *Q.*  What time periods did you have these drug issues?

4    *A.*  From 2009 to 2000 -- until recently, until before getting

5    incarcerated.

6    *Q.*  Were you incarcerated in February 2022?

7    *A.*  Yes, I was incarcerated February 22, 2022.

8    *Q.*  Along the way have you been to rehab?

9    *A.*  I have, yes, sir.

10   *Q.*  Where did you attend rehab?

11   *A.*  All throughout South Florida.

12   *Q.*  During the time period of this case, again January 2020 to

13   July 21, did you use drugs?

14   *A.*  I did, yes, on and off.

15   *Q.*  How often?

16   *A.*  Not as often as my younger days because I was on different

17   medications to keep me off, but often enough.

18   *Q.*  Did you take prescription medications?

19   *A.*  I did, yes.

20   *Q.*  Did you get those off the street at times?

21   *A.*  I did, both from the doctor and off the street, yes.

22   *Q.*  Now, are you presently at the jail being treated for

23   substance use disorder?

24   *A.*  I am.

25   *Q.*  Is that called medication treatment assistance, or MTA?

```
 1   A.  Yes, sir.

 2   Q.  Do you receive medication at the jail?

 3   A.  Yes.

 4   Q.  Other than the medication you receive from the program, are

 5   you sober now?

 6   A.  Yes, 19 months.

 7   Q.  Since you have been incarcerated?

 8   A.  Yes, sir.

 9   Q.  So, let's jump to Broad Street, January 2020.  At that

10   time, and throughout this entire period, where were you living?

11   A.  In Broward County and Palm Beach County, Florida.

12   Q.  Around January of 2020, did you partner with Tom Daugherty

13   to own a call center?

14   A.  I did, yes.

15   Q.  Was the original name Broad Street?

16   A.  Yes, that was the name.

17   Q.  Where was the business located?

18   A.  Broward County, Florida.

19   Q.  Now, you mentioned a few other names you used.  At some

20   point, did you change the name of the call center from Broad

21   Street to something else?

22   A.  Yes, eventually from Broad Street Lifestyles to Olympus

23   first and then we opened up DMC Group.

24   Q.  Approximately when did it transition from Broad Street to

25   Olympus?
```

Pauline A. Stipes, Official Federal Reporter

```
1    A.  We transferred from Broad Street to Olympus in the winter

2    of 2020, maybe December.

3    Q.  I would like to show you what has been admitted as

4    Government Exhibit 890-A.

5        What are we looking at?

6    A.  That was one of our offices for Broad Street Lifestyles,

7    that was like our headquarters.

8    Q.  Was your call center housed there?

9    A.  Yes, it was.

10   Q.  Where was that located?

11   A.  Deerfield Beach, Florida, Broward County, Florida.

12   Q.  Did you have an office there?

13   A.  I did, yes, sir.

14   Q.  Approximately how long did you operate personally out of

15   that office?

16   A.  2020, about a year.

17   Q.  Did you have another location as well?

18   A.  We did.  We had a few locations.

19   Q.  I would like to show you 890-B, already admitted.  Now,

20   this looks similar.  What are we looking at?

21   A.  That is the office for Doctor Chase, it was in the same

22   shopping center.

23   Q.  And did Jose Goyos work out of this office?

24   A.  He worked out of both, 450, and then -- yes, he worked in

25   this one, yes, he did.
```

Pauline A. Stipes, Official Federal Reporter

1    Q.  Approximately when did he move from 450 that is in 890-A,

2    the first photograph?

3    A.  Yes, 450, he moved from there to this office maybe a few

4    months after he started working.

5    Q.  So, if he started there in approximately June, when would

6    he have moved here?

7    A.  Maybe August.  I don't know the exact month, but I would

8    say August.

9    Q.  I would like to show you what is admitted as Government

10   Exhibit 890-C and 890-D side-by-side, please.

11       Eventually, did you move your call center into one

12   location?

13   A.  Yes, sir, we did.

14   Q.  So, did you combine the sales floor and Doc Chase into one

15   office?

16   A.  Yes.  Eventually we put them all under the same roof.

17   Q.  What is depicted in the photographs 890-C and $890-D?

18   A.  That is our office in Boca Raton, Florida, I believe it was

19   1200 North Federal Highway.  It was eventually our last office

20   that we operated in, our bigger office.  We put all of our

21   campaigns under one roof.

22   Q.  Is it fair you moved here sometime around December 2020,

23   and you were there until the end of the operation, or call

24   center, rather?

25   A.  Yes, we moved there around December, beginning of January,

```
 1   and then all the way up until we closed down.
 2   Q.  Why did you close down?
 3   A.  Because we were raided by the Federal Government.
 4   Q.  All right.  Thank you.
 5       Approximately how many employees did you have at Broad
 6   Street around June 1, 2020?
 7   A.  We had between 50 to 100 employees, give or take.
 8   Q.  And at that time, June 1, 2020, what campaigns was your
 9   call center running?
10   A.  We were only running the cardiac campaign for laboratories
11   for Medicare Part B recipients.
12   Q.  Prior to this, did you operate durable medical equipment
13   campaigns as well?
14   A.  Yes, we were.
15   Q.  At the time Jose Goyos started, was your office winding
16   down the DME campaigns?
17   A.  Yes, we were transitioning to strictly laboratory.
18   Q.  What was your goal in owning and operating these call
19   centers?
20   A.  To make as much money as possible.
21   Q.  Again, how did you make money?
22   A.  By selling doctors' orders or billing Medicare Part B.
23   Q.  Did any doctors work at the call center?
24   A.  No, sir.
25   Q.  Did any medical professionals work at the call center?
```

```
 1    A.  No, sir.

 2    Q.  So, I want you to describe for the jury how many different

 3    ways you actually obtained, meaning your call center operation,

 4    a signed doctor's order.

 5    A.  Well, I mean, our main way, obviously, we generated it

 6    in-house, in our call center, and we'd buy them from other call

 7    centers that we'd pay per order, set out something called a

 8    down line, which were different call centers to submit orders

 9    to us or leads to us, is what we called it.

10    Q.  How many different ways did you actually get a signature on

11    the line where the doctor is supposed to sign?

12    A.  Well, we would do -- at first we started doing

13    telemedicine, which was a doctor we paid per order.  He signed

14    whatever we paid him to sign.

15         Then we went to Doctor Chase, that is where we would get

16    the patient's primary care physician to sign via the telephone,

17    and eventually -- and we would forge the orders as well.

18    Q.  Was Jose Goyos working at the call center when you were

19    paying telemedicine doctors to sign whatever orders you gave

20    them?

21    A.  Yes, he was.

22    Q.  Was he involved in that?

23    A.  Yes, he was.

24    Q.  We will come back to that.

25         Now, you mentioned that you compensated telemedicine
```

| | |
|---|---|
| 1 | doctors to sign these orders.  How did you pay them? |
| 2 | A.   I mean, we would send them wires, send them money, cash, |
| 3 | wires from our bank to their bank. |
| 4 | Q.   What was the going rate for a doctor's order for a genetic |
| 5 | test? |
| 6 | A.   Anything from 30 to 40 bucks per order, 30 to $40 per |
| 7 | order, depending on volume. |
| 8 | Q.   Now, did you ever have to pay any companies in order to get |
| 9 | the telemedicine doctors to sign the orders? |
| 10 | A.   Yes, we paid Conclave Medical as well as the Barton Group. |
| 11 | Q.   Do you know someone named David Santana? |
| 12 | A.   I do, yes. |
| 13 | Q.   Who is that? |
| 14 | A.   He is the owner of Conclave Medical. |
| 15 | Q.   Is Conclave Medical located in Massachusetts? |
| 16 | A.   Yes, that is where it was eventually located, also located |
| 17 | in South Florida where I met him. |
| 18 | Q.   Conclave Medical and Barton, those are two companies you |
| 19 | paid so you would get doctors' orders in exchange? |
| 20 | A.   Yes. |
| 21 | Q.   So, throughout the duration when you were operating Broad |
| 22 | Street and the telemedicine aspect of it, how much money in |
| 23 | total did you pay these telemedicine companies for doctors' |
| 24 | orders? |
| 25 | A.   Millions of dollars. |

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 60 of 180

25 of 104
60

1    Q.  You said you had employees forge doctors' orders?

2    A.  Yes.

3    Q.  Is this for DME and genetic testing orders?

4    A.  For both, yes.

5    Q.  Focusing on genetic testing, give us an example of how this

6    worked.

7    A.  Well, for forging of signatures, we had a time frame to

8    where we needed to get these orders to the laboratories.  We

9    would have a contract with the laboratory and get paid on a

10   weekly basis, so we would make sure the orders got to them on

11   Wednesday or Thursday so we could get paid by Friday to cover

12   our expenses.

13       We would prepopulate the doctors' signature before the

14   doctor signed it to send it to the laboratories, and we changed

15   billing codes, patient information, after the doctor already

16   signed the order.  So --

17   Q.  You said we.  Who is "we"?

18   A.  Tim Richardson, Ashley Sigaroa, these are managers at my

19   call center, my brother, Louis Carver, Detally (phon)

20   Fairweather and Jose Goyos.

21   Q.  The Defendant, Jose Goyos?

22   A.  Yes.

23   Q.  Did he falsify medical records?

24   A.  He did, yes, sir.

25   Q.  How many times?

```
 1   A.  I don't know the number off the top of my head, hundreds.

 2   Q.  I want to jump back to your recruitment of Mr. Goyos.   In

 3   May of 2020, you were already operating this call center,

 4   correct?

 5   A.  Yes, sir.

 6   Q.  Did Mr. Goyos reach out to you?

 7   A.  He did, sir, yes.

 8   Q.  Prior to this, did you know Mr. Goyos?

 9   A.  I did, yes.

10   Q.  Without getting into where you met him, but how long ago

11   did you meet him?

12   A.  2011, I would say.

13   Q.  At that time, in 2011, did you learn that Mr. Goyos had

14   been involved in telemarketing?

15   A.  I did, yes.

16   Q.  What type of telemarketing campaign was he involved in?

17           MS. McCRAE:  We object, 404(b) objection.

18           THE COURT:  Your objection is preserved.

19           Ladies and gentlemen, as I have cautioned you in the

20   past, you shouldn't consider any such prior references to a

21   term of imprisonment except for the limited purposes that I

22   have delineated, which would include considering whether the

23   Defendant had the intent and whether he acted by accident in

24   this case.

25           Beyond that, as I have indicated, you should not
```

Pauline A. Stipes, Official Federal Reporter

```
 1    consider that testimony to evaluate the Defendant's substantive

 2    guilt and you should consider whether the Government has proven

 3    its case with respect to this Defendant only for the crimes

 4    charged in this indictment.

 5            With that, let's continue.

 6            MR. QUEENAN:  Thank you, Judge.

 7    BY MR. QUEENAN:

 8    Q.  In May 2020, why did Mr. Goyos reach out to you?

 9    A.  He was looking for a job.

10    Q.  Where was he living at that time?

11    A.  I believe he was living in Miami at a halfway house.

12    Q.  And how did he reach out to you?

13    A.  The telephone.

14    Q.  At that time, did you communicate with Mr. Goyos by phone?

15    A.  Yes, sir.

16    Q.  Now, when Mr. Goyos reached out to you, was he under

17    supervision?

18    A.  He was, yes.

19    Q.  What type of job was he looking for?

20    A.  Um-m-m, something he was familiar with, like more of like a

21    back end position at a call center type job.

22    Q.  And what did he say to you about his supervision as it

23    related to a job at a call center?

24    A.  He did not want me to disclose that it was a call center

25    because I don't think he was allowed to work there, or I don't
```

Pauline A. Stipes, Official Federal Reporter

1    know if he wanted to let his -- the supervisor that was

2    supervising him know it was a call center.

3    Q.   When you say disclosed, were you involved in disclosing his

4    employment at some point?

5    A.   I was, yes.

6         MR. QUEENAN:  Your Honor, I would like to show the

7    witness what is marked for identification as Government

8    Exhibits 1207 and 1207-A.

9         Mr. Carver, can you read -- not out loud, is it too

10   long small?  Can you read Exhibit 1207.

11        MS. McCRAE:  Your Honor, may we approach?

12        THE COURT:  Okay.

13        (Thereupon, the following sidebar conference was had:)

14        THE COURT:  Okay, what is the issue?

15        MS. McCRAE:  I want to bring up that this exhibit is

16   admitted, we preadmitted them before the testimony began, and

17   we maintain our 404(b) objection.  We are reserving our

18   objection to them.  I am assuming the Court does not want us to

19   continue to object.  I have a continuing objection to the

20   404(b) issue.

21        THE COURT:  Yes, I think that is permissible.  Once

22   this line of inquiry is completed, though, we are back to the

23   normal practice of objecting to the normal testimony if you

24   think there is an issue.  Your standing objection relates and

25   correlates only to the questions related to the halfway house,

```
 1    recruitment of Mr. Goyos from the halfway house, and any
 2    references to his prior conviction for telemarketing fraud.
 3            MS. McCRAE:  Thank you, Judge.
 4            (Proceedings at sidebar concluded.)
 5            THE COURT:  You may proceed.
 6            MR. QUEENAN:  Thank you, Judge.  If we may publish
 7    what is admitted as Government Exhibits 1207 and 1207-A to the
 8    jury.
 9    BY MR. QUEENAN:
10    Q.  Mr. Carver, we have blown up for you here Government
11    Exhibit 1207.  What is this document?
12    A.  It is an email.
13    Q.  Who is it from?
14    A.  Jose Goyos.
15    Q.  What is his email address?
16    A.  Jrgoyos@gmail.com.
17    Q.  Did you know him to use that email?
18    A.  Yes.
19    Q.  Did you know him to use any other email while he worked for
20    you?
21    A.  I believe he created an email for our company as well.
22    Q.  Do you recall what that was?
23    A.  Either his first name and initial or his name
24    @broadstreet.com.
25    Q.  Something along those lines?
```

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 65 of 180 **65**
30 of 104

```
 1   A.  Yes.

 2   Q.  Is that your email there, too?

 3   A.  Yes, it is.

 4   Q.  What is the date of this email?

 5   A.  May 18, 2020.

 6   Q.  What is the title up top?

 7   A.  Jose Goyos Employment Form.

 8   Q.  Can you take your time and read this to the jury?

 9   A.  "Danny, I need you to fill this out and get it back to me

10   today so that I can start working.  Here is my information so I

11   can put it on the form.  Resident name, Jose Goyos, register

12   number 03937-104, case manager, Mr. Gadson, your company

13   information.  Job title needs to say administrative.  Duties,

14   office administrative work, meeting with clients at their

15   offices for implementation of company products and services.

16   Work schedule, Monday through Saturday, 9:00 a.m to 7:00 p.m.

17   Wages, $1 million paid every day, just kidding.  However you

18   all do it.  Let's talk about this.  Start date, put 5/19/2020".

19   Q.  Did you receive this email?

20   A.  I did, yes.

21   Q.  Prior to receiving this email, did you have a conversation

22   with Jose Goyos about all of this?

23   A.  I did, yes.

24   Q.  Were you aware that he needed you to fill out a

25   verification form for the Salvation Army?
```

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 66 of 180   66

31 of 104

 1    A.   Yes, he told me that he would help me do it.

 2    Q.   What instructions beyond this email did he give to you?

 3    A.   He told me to make sure that it was not a call center, I

 4    could not put down that it was a call center.  He told me to

 5    change the name of the company to -- I believe we changed it to

 6    Conclave Medical, and he also told me to say he had to travel a

 7    little bit, he was on an ankle monitor, so he could move around

 8    a little bit.

 9    Q.   So, in reality, were you hiring him to work at Broad Street

10    Lifestyles?

11    A.   Yes, I was.

12    Q.   Was that a call center?

13    A.   Yes.

14    Q.   He instructed you to lie on this form?

15    A.   Yes.

16    Q.   Did you?

17    A.   I did, yes.

18    Q.   If we could turn to what has been admitted as Government's

19    Exhibits 1107 and 1106.

20         Mr. Carver, did you sign these forms?

21    A.   I did, yes.

22    Q.   If you could zoom in on the signature lines of the

23    document, please.  Thank you.

24         Are those your signatures?

25    A.   They are, yes.

 1    Q.  In these forms, did you falsely disclose to the Salvation

 2    Army, who was running an employment verification form for the

 3    reentry program at the Bureau of Prisons, did you lie to them?

 4    A.  I did, yes.

 5    Q.  Did Jose Goyos tell you to do this?

 6    A.  He did, yes.

 7    Q.  Now -- thank you.

 8        Before bringing Mr. Goyos in as an employee, did you talk

 9    about this with your partner at that time, Tom Dougherty?

10    A.  Yes, I did.

11    Q.  What did you talk about?

12    A.  Just about bringing Jose on.  We knew that he had just got

13    out of Federal prison, but we knew that he was good at doing

14    what he does, which was running a call center, helping, you

15    know, run parts of call centers, especially what we were doing,

16    and we actually did a pros and cons list on a white board.

17    Q.  What were some of the pros?

18    A.  Very smart, made a lot of money in a previous scam.  You

19    know, he knew how to speak the medical lingo due to having, I

20    guess, family in the medical field, you know, he was going to

21    make us a lot of money.  I can't think of all of them right off

22    the top of my head.

23    Q.  Can you think of any of the cons?

24    A.  The main one was he was just out of prison and probably was

25    being watched by the FBI.

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL    Document 994    Entered on FLSD Docket 01/27/2024    Page 68 of 180 68
33 of 104

```
 1   Q.  Why were you worried about that?

 2   A.  Because of what we were doing.

 3   Q.  Did you ultimately decide to hire him anyway?

 4   A.  Yes, we did.

 5   Q.  At some point, did you promote him to manager?

 6   A.  Immediately.

 7   Q.  Now -- just one moment, your Honor, I apologize.

 8       Now, when Mr. Goyos first started in June 2020, that form

 9   was signed on June 2, 2020, did you own any labs at that point?

10   A.  I think we either were just purchasing Cergena or right

11   there, about to be purchased.  I believe we might at that time

12   have had Cergena Laboratories.

13   Q.  Do you recall when you first submitted claims to Medicare

14   through those labs?

15   A.  Through Cergena, summer of '20, so I would say June, July,

16   we started processing claims.

17   Q.  During that time period, were you still selling doctors'

18   orders that you got scripted through telemedicine to the labs?

19   A.  Yes, we were.

20   Q.  Now, when Mr. Goyos started, who did he work with?

21   A.  He worked with Ashley Sigaroa, and he also worked with my

22   brother, Louis Carver, and I believe Detally Fairweather.

23   Q.  Please remind the jury, where was it physically that he

24   worked when he first started?

25   A.  In the first picture of 450 Fairway, which was like out
```

```
 1    headquarters for Broad Street Lifestyles.

 2    Q.  Where you kept your office, too?

 3    A.  Yes.  He had a big office such as me.

 4    Q.  What was his role at that time?

 5    A.  He worked at the back end, he was inputting doctors' orders

 6    that we were selling to Signify Laboratories.

 7    Q.  Let's walk through the process at that point.  What is the

 8    first step of the process?

 9    A.  The first step is a call center representative reaches out

10    to a patient over the age of 65, and tries to deceptively

11    convince them to receive a cardiac genetic test.

12    Q.  Let me step back.

13          THE COURT:  Can you stand behind the podium, please.

14          MR. QUEENAN:  Yes, your Honor.

15    BY MR. QUEENAN:

16    Q.  Let me step back.  How do your reps know who to call, your

17    telemarketers?

18    A.  We would buy data for very cheap from a data vendor, name,

19    address, phone number, obviously they have to be over the age

20    of 65 years old, and sometimes it would come with Medicare ID

21    numbers as well.

22    Q.  Let me be clear, the data you bought --

23       (Loud thunder.)

24          THE COURT:  All right.  Let's keep going.

25
```

**Pauline A. Stipes, Official Federal Reporter**

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL    Document 994    Entered on FLSD Docket 01/27/2024    Page 70 of 180
35 of 104
70

```
 1   BY MR. QUEENAN:

 2   Q.  The data that you purchased, it had information such as --

 3   could you describe it again for the jury?

 4   A.  Yes, first name, last name, phone number, address,

 5   obviously over the age of 65, Medicare ID numbers sometimes,

 6   just your basic information.

 7         THE COURT:  All right.  Let's take a ten-minute break

 8   to see if this is going to be a recurring issue, and then we

 9   will bring you in with any updates.  All rise for the jury.

10      (Thereupon, the jury leaves the courtroom.)

11         THE COURT:  All right.  We will be in a brief break to

12   see if we are running on generator power, in which case I am

13   not sure how much longer we would have.  Stand by, Mr. Carver.

14   If you need to use the facilities, you are welcome to arrange

15   that.  Marshals, please proceed.  Thank you.

16      (Thereupon, a short recess was taken.)

17         THE COURT:  All right.  Let's call the jury in.

18         MS. McCRAE:  Your Honor, Mr. Goyos just ran to the

19   restroom.

20         THE COURT:  Okay.  Okay, let's call the jury in,

21   please.  The Defendant is in the courtroom.

22         (Thereupon, the jury returned to the courtroom.)

23         THE COURT:  All right.  Please be seated.  Let's

24   continue.

25         MR. QUEENAN:  Thank you, Judge.
```

**Pauline A. Stipes, Official Federal Reporter**

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 71 of 180

36 of 104

71

 1   *BY MR. QUEENAN:*

 2   *Q.*  Before that break we were talking about the data you were

 3   purchasing.  You had just described to the jury what

 4   information was in that data.

 5       How does the data get over to the telemarketing floor?

 6   *A.*  The data provider usually will email it to us to upload it

 7   into a dialer, a phone dialer we have.

 8   *Q.*  What is a dialer?

 9   *A.*  Kind of like a computer screen in front of you that we have

10   a bunch of names and phone numbers in there so they don't have

11   to physically hand dial those, and it would dial the calls and

12   then the telemarketer can disposition if the person answered,

13   if they sold the deal, didn't sell the deal, so on and so

14   forth.  They can dial as many numbers as they possibly can.

15   *Q.*  Are these calls to the patients recorded?

16   *A.*  Yes, they are.

17   *Q.*  What is the goal of the cardiovascular campaign, genetic

18   testing, what is the goal of the call?

19   *A.*  To get the patient to obviously say, yes, they want to take

20   the test so we could ship it to them.

21   *Q.*  Do you need to get certain information as well as the yes,

22   we will take the test?

23   *A.*  Yes, we do.

24   *Q.*  What information do you need from them?

25   *A.*  We need to verify their information that we already have,

```
 1   and we need to get many symptoms so we can put that on the

 2   requisition form, like medical symptoms that they have, ID

 3   number, Medicare insurance number, as well as we need to just

 4   get as much information to put on their requisition form and

 5   their doctor's information as well.

 6   Q.   Why is it important to get the Medicare ID number?

 7   A.   To bill Medicare.

 8   Q.   Now, what is it called when you have a successful call?

 9   What is that called?

10   A.   A sale.

11   Q.   Do you also call it a deal?

12   A.   Or a deal, yes.

13   Q.   Now, do the call center reps have scripts that they use as

14   guides during the calls?

15   A.   They do.

16   Q.   Do these scripts evolve over time depending on the

17   campaign?

18   A.   Yes, we are always changing them or tweaking them.

19   Q.   You say we.  Who is involved in the process of changing and

20   tweaking call scripts?

21   A.   The managers.

22   Q.   Who were the managers at the time that Jose Goyos worked

23   there, so June 2020 to July 2021?

24   A.   John Hughes, Mike Skolski, Jose Goyos, Ashley Sigaroa, Tim

25   Richardson, Ethan Macier, Mike Gergis, Joy Desmond, Tyler
```

```
 1    Roman, Shane Glen.  I don't know if I missed one or two, we had
 2    a bunch of them.
 3    Q.  Now, would you meet with your managers?
 4    A.  Every Monday morning.
 5    Q.  And you mentioned the call scripts for the campaigns would
 6    evolve.  Were those discussed at those meetings?
 7    A.  Sometimes they would discuss them, sometimes they wouldn't,
 8    most of the times, yes.
 9    Q.  What would you call those meetings?
10    A.  Manager meetings.
11    Q.  We will come back to that.
12         With regard to the call scripts, when the telemarketing rep
13    is on the phone following the script and receiving the
14    information that you need, that you just mentioned, what are
15    they doing with the information?
16    A.  They are prepopulating it on to a requisition form in our
17    CRM.
18    Q.  Mechanically, how does that work?
19    A.  Like how do they physically -- so, they have two computer
20    screens in front of them, they will be on the phone with a
21    headset, and on one screen they have the dialer information,
22    which has all the patient information on it, and as they are
23    taking the information down via the telephone, it is going onto
24    the other screen, which usually has the CRM up.
25    Q.  Is there certain information that they are eliciting,
```

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 74 of 180
39 of 104
74

```
 1   right?  So during these calls they are asking about conditions
 2   and symptoms, you mentioned that.
 3       What response is prompting them to fill in this requisition
 4   form?
 5   A.  Well, they have to get yeses, and they have to ask those
 6   questions, and they will walk them into the question to get a
 7   yes.  So, it is really just, you know, if they ask a question
 8   and the person says no, they will kind of walk them into it,
 9   and try to get a yes out of them on a recorded line to type it
10   into the requisition form.  I don't know if that is what you
11   are asking me.
12   Q.  That is what I am asking you.  Is that a common tactic in
13   call centers?
14   A.  Yes, it is.
15   Q.  What do you call that?
16   A.  Rebutaling, deceptive marketing, I guess.  We call it
17   rebutaling.
18   Q.  You mentioned they are typing it into the CRM?
19   A.  Yes, sir.
20   Q.  Describe briefly what the CRM is.
21   A.  A CRM is like our server for all of our information for our
22   patients.  At the time we were using something called zoho,
23   it's a pretty broad CRM, anybody can sign up and use it.  It is
24   like something that we will create, the drop down boxes, what
25   features we want to store our patient information to eventually
```

```
 1   go and generate a requisition form.

 2   Q.  Did you eventually move to a second CRM?

 3   A.  Yes, we created our own CRM.

 4   Q.  With regard to each CRM, zoho -- what did you call the

 5   second one?

 6   A.  Lab Link.

 7   Q.  When Mr. Goyos was working at the call center, did he work

 8   under both CRMs?

 9   A.  He did, yes.

10   Q.  What does CRM stand for, do you know?

11   A.  I don't remember, sorry.

12           MR. QUEENAN:  I tried, Judge.

13   BY MR. QUEENAN:

14   Q.  With the two platforms, you had how many employees at Broad

15   Street?

16   A.  I mean, in the end we probably had 50 plus, 60 plus.  We

17   had to move to a bigger office because we were getting bigger

18   and bigger.

19   Q.  The CRM software, does it involve all aspects of the

20   business?

21   A.  Yes, every aspect.

22   Q.  Think of your lowest level employees, do they have access

23   to all aspects of the CRM?

24   A.  No, they don't.

25   Q.  Were they locked out of certain things?
```

Pauline A. Stipes, Official Federal Reporter

 1    *A.*   Of course.

 2    *Q.*   Was anyone granted kind of carte blanche, all access?

 3    *A.*   Yes.

 4    *Q.*   How many folks?

 5    *A.*   Ten, 12, just the managers.

 6    *Q.*   How about yourself?

 7    *A.*   Of course, I was the owner.

 8    *Q.*   Jose Goyos?

 9    *A.*   Yes, he was.

10    *Q.*   Does this CRM give you insight into the entire business

11    model?

12    *A.*   Yes.

13    *Q.*   Can you get into the sales information?

14    *A.*   You can get into everything.

15    *Q.*   Kit chase?

16    *A.*   Yes.

17    *Q.*   Doc chase?

18    *A.*   Everything.

19    *Q.*   Everything?

20    *A.*   Yes, sir.

21    *Q.*   Now, along the way, going back to the telemedicine, once

22    you have a deal and the information you have is put into a CRM,

23    think back to when Mr. Goyos first started, where does this

24    order go from there?

25    *A.*   From when the sales clerk talks --

```
 1    Q.  Walk the jury through the sales call.  They're typing the
 2    information into the CRM, they have a deal, now what?
 3    A.  At that point we -- we call it out triage process, our back
 4    end.  If it was lab, it went to the lab part of the back end,
 5    which would be Ashley, Jose, a woman by the name of Detally,
 6    and my brother, and at that point they would fix the order,
 7    make sure that it was a billable or a sellable order.
 8    Q.  What do you mean, fix it?
 9    A.  Well, when you have a sales rep that is talking to hundreds
10    of people every day, they make mistakes.  They will type in a
11    Medicare number wrong, a billing code wrong, or a billing code
12    would be populated wrong, symptoms would not be checked off.
13    They have to make sure all of those items were one hundred
14    percent before it went to a lab for us to sell it or for us to
15    bill it.
16    Q.  Did Jose Goyos do this?
17    A.  Yes, sir.
18    Q.  Did he call the patient back to make sure the stuff he was
19    changing on the form lined up to what the symptoms were?
20    A.  No, that would be impossible.
21    Q.  The goal of this triage was to make the requisition order
22    billable?
23    A.  Billable or sellable.
24    Q.  I would like to show you what is admitted as Government
25    1208-A.  Mr. Carver, do you recognize this document?
```

Pauline A. Stipes, Official Federal Reporter

 1    A.   Yes, I do.

 2    Q.   What is this?

 3    A.   This was our cardio triage process, cardiovascular triage

 4    process.

 5    Q.   Is this a step-by-step process that was in place for Mr.

 6    Goyos when he walked in to work at your call center?

 7    A.   Yes.

 8    Q.   Was this document provided to him to help guide him in

 9    terms of what he needed to do?

10    A.   Yes, it was.

11    Q.   Who else did he work with at that time?

12    A.   My brother, Louis Carver, another manager, Ashley Sigaroa,

13    and I believe Detally Fairweather.

14    Q.   If we could zoom in on the top six.

15         Mr. Carver, could you just read them and explain in

16    laymen's terms what this is describing?

17    A.   Okay.  Number one, select cardiovascular lab order under

18    statue ready for triage.

19         That is kind of saying it is ready for triage, ready to

20    go into -- this was more for telemedicine, so this is like when

21    we were paying the doctors per order.  This was to go ready for

22    triage to get sent over to telemed for the doctor to sign it.

23         Number two, attach the patient chart.  If duplicate charts,

24    select the most recent created date.  Kind of like, if you are

25    familiar with a chart at a doctor's office, we kind of -- I

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL    Document 994    Entered on FLSD Docket 01/27/2024    Page 79 of 180
44 of 104
79

```
 1    want to say duplicated that to make it to where we could see

 2    their symptoms.

 3    Q.  Can you slow down on that.  Can you explain that?

 4    A.  Sure.

 5    Q.  Did you request actual doctors' notes or patient charts

 6    from these patient?

 7    A.  No.  We just made it up as we went.

 8    Q.  Continue.

 9    A.  Number three, insure all patient chart information is

10    correct, name, date of birth, primary insurance, Medicare,

11    primary insurance member ID.  That is obviously so we can have

12    the information correct to send over for the doctor to sign it.

13        The most important thing is that it was a Medicare ID -- it

14    was Medicare Part B, I apologize, and the insurance information

15    was correct.  If it wasn't, we could not sell that deal.  We

16    would lose money on that.

17        Number four --

18    Q.  Let me ask a followup question.  Did you have an incidence

19    where the sale call already occurred and it made its way to

20    triage, but the patient wasn't Medicare Part B?

21    A.  Of course.

22    Q.  What would you do with that record?

23    A.  We'd trash it.

24    Q.  You just had a call with a patient convincing them they

25    needed this test?
```

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL    Document 994    Entered on FLSD Docket 01/27/2024    Page 80 of 180
45 of 104
80

```
 1    A.   Yes.

 2    Q.   How often did you guys just throw them in the trash?

 3    A.   Daily, every day.

 4    Q.   This is describing the role that Mr. Goyos played at the

 5    call center?

 6    A.   Yes, sir.

 7         Number four, spell out all current medical conditions such

 8    as HBP, high blood pressure, HC, high cholesterol.  We couldn't

 9    abbreviate any of their symptoms, so it had to look good for

10    the doctors.

11         Number five, take note of patient's current medical

12    conditions for DX codes under cardiovascular triage section.

13    We needed to have patient notes, there were different codes for

14    each condition.

15         And then number six, return to lab order.  That was kind of

16    like to finalize it.

17    Q.   Can you scroll down.

18         Continue, please.

19    A.   Number seven, select cardio DX codes based on medical

20    conditions and cardiac related symptoms.  Again, it was kind of

21    different codes for different symptoms.  Symptoms were

22    important, that justified why they needed the test.

23         Number eight, enter all medical conditions from chart to

24    personal cardiac conditions.  That was just another process in

25    the rec form to get to the final order at the end of it.
```

 1        Number nine, enter all family history and DX age under

 2   cardiovascular personal history.  Spell out abbreviated

 3   conditions.  This was important for two reasons, it needed to

 4   be personal history, they needed -- these symptoms needed to be

 5   personal, meaning it couldn't run in their family tree.  It

 6   couldn't be like, hey, does your sister, brother, it had to be

 7   personal history.

 8        Also if they had other personal history for any other test

 9   we could possibly sell, we could make more money on that.

10   Q.  When you said it had to be, are you referring to making it

11   billable?

12   A.  A hundred percent, yeah, to make it billable, to make it so

13   we could get paid.

14        Number ten, select telemed physician and enter patient's

15   correct address.

16   Q.  Can you explain that?  What is -- Mr. Goyos and the others

17   doing this, what is on number ten?

18   A.  They are selecting what physician to assign to that patient

19   based upon, really, just what state they were in.

20   Q.  So is there like a drop box?

21   A.  There is.

22   Q.  And these are your doctors on payroll?

23   A.  These are our doctors that were on our payroll, yes.

24   Q.  I am saying that casually.  These are the doctors that --

25   A.  We were paying.

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL    Document 994    Entered on FLSD Docket 01/27/2024    Page 82 of 180
47 of 104
82

1    Q.  Was there a prior relationship between the patient and the

2    doctors that Jose Goyos was choosing for them?

3    A.  These was no relationships.  These were doctors we knew and

4    we would pay and they would sign off on 99 percent of the

5    orders that we sent over.

6    Q.  Did Jose Goyos know this?

7    A.  Yes, he did.

8    Q.  How?

9    A.  We told him, we would have meetings about it.

10   Q.  Is this how the business made money?

11   A.  This is how we generated our money.  This was our bread and

12   butter.  At this time, by having these doctors signing off on

13   the scripts, that would make it a billable order.

14   Q.  Just for the record, we are going to continue reviewing

15   1208-A.

16   A.  Number 11, click the three dot menu on top right and select

17   mail merge.  I don't remember exactly what that meant.  I think

18   it meant merge the order together.

19       And number 12, select signify cardio rec form from the drop

20   down menu.  That was showing what lab we were selling the order

21   to.

22            MR. QUEENAN:  Just one moment, your Honor.

23            So, you say -- I apologize to the Court.  If we could

24   go back to that exhibit.

25

Pauline A. Stipes, Official Federal Reporter

```
 1   BY MR. QUEENAN:
 2   Q.  Number 12 was select signify rec form.
 3       At that time what labs were you selling these doctors'
 4   orders to?
 5   A.  Just to Signify.
 6   Q.  So, what happens when you select Signify rec form?
 7   A.  It prepopulates all the information onto the rec form.
 8   Q.  And the rec form is the doctor's order, correct?
 9   A.  Yes, it is the same thing.
10   Q.  Can you finish up on this page and we'll turn to page two?
11   A.  Thirteen, scroll to the fourth page and select all check
12   boxes that match the patient's medical conditions.  DX code,
13   cardiac -- relative cardiac history and type in DX age.
14   Q.  DX is diagnosis?
15   A.  Yes.
16   Q.  Can you blow up the second page a little more.
17       What is the next instruction?
18   A.  Arhythmia and/or cardiomyopathy must be checked on all
19   orders.
20   Q.  What does that mean?
21   A.  That is the test we were running, we needed to check that
22   for billing purpose for Medicare.
23   Q.  During this triage process, if a deal was done and made its
24   way to Jose Goyos and that wasn't checked, would Mr. Goyos just
25   check that box?
```

1    *A.*  Yes, he would.

2    *Q.*  Keep reading, please.

3    *A.*  For heart disease, disorders, cardiac attacks, stents,

4    blockage, select cardiomyopathy.  For racing, slow heartbeat,

5    fluttering in chest, palpitations, afibs, pacemaker, select

6    arhythmia.  Check other conditions, symptoms, check as many

7    boxes as possible.  Use the check box, any problems

8    with exercise or kicko episodes.

9       Fourteen, select preview merge on left side of menu.

10      Fifteen, please slow down and make sure all info is filled

11   out correctly before submitting.  Some orders are getting

12   submitted without fully loaded.

13      That was super important.  All information had to be done

14   correctly.  If it didn't, it came back and sometimes we would

15   get charges for that order, and get double charged.  That would

16   become a problem when it came into numerous orders and also

17   wasn't a billable order.

18   *Q.*  What do you mean double charge?  The lab is not going to

19   pay for the doctor's order, but you would have to pay the

20   prescription?

21   *A.*  Yes, they would make us pay sometimes double for the

22   doctor's signature.

23      Sixteen, go to top right and click send.  Self-explanatory.

24      Seventeen, change name to patient first name, patient last

25   name, cardiac.  That was to label that it was cardiac, because

Pauline A. Stipes, Official Federal Reporter

```
 1   at the time we were still doing durable medical equipment.
 2       Eighteen, type in telemed physician's email and complete
 3   name.  Refer to the spreadsheet for correct email and
 4   addresses.
 5       Nineteen, click send and continue.
 6       20, change from ready for triage to sent to telemed.
 7       And 21 was complete.
 8   Q.  Where does it go from there?
 9   A.  It goes right to the telemed, the doctors.
10   Q.  How does it get to the telemed doctor?
11   A.  Through the CRM.
12   Q.  How many orders a day are you sending to your telemedicine
13   doctors?
14   A.  For laboratory?
15   Q.  Yes.
16   A.  Um-m-m, I think we were doing a hundred to 200 a week at
17   this point.  So, if you want to break that down evenly, I guess
18   that probably would be best, 20 to 40 a day.
19   Q.  And how quickly would you get these orders back?
20   A.  Oh, within four days, five days.  Immediately.
21   Q.  Were those doctors calling the patients?
22   A.  No.  It --
23          MS. McCRAE:  Object to foundation.
24   BY MR. QUEENAN:
25   Q.  Are you aware as to how Conclave --
```

```
 1              THE COURT:  Hold on.  Lay an additional foundation,
 2   Mr. Queenan.
 3              MR. QUEENAN:  Absolutely, Judge.
 4   BY MR. QUEENAN:
 5   Q.  Are you aware as to how the telemedicine business model
 6   worked?
 7   A.  Yes, I was.
 8   Q.  Did you travel up to Massachusetts on a handful of
 9   occasions to meet with the telemedicine company?
10   A.  I did, yes.
11   Q.  What was your understanding in terms of how those doctors
12   were handling those orders?  Were they calling the patients?
13              MS. McCRAE:  Objection to the hearsay and
14   confrontation clause.
15              THE COURT:  Overruled.
16              THE WITNESS:  Can I answer?
17              THE COURT:  Yes, you may.
18              THE WITNESS:  Repeat that last thing.
19   BY MR. QUEENAN:
20   Q.  Were those doctors calling those patients?
21   A.  No.  We paid them for signatures, we called it rubber
22   stamping.
23   Q.  Was that the deal?
24   A.  That was the deal.
25   Q.  Now, Signify, who owned that lab at that time?
```

| 1  | A.  Jamie McNamara. |
|----|----|
| 2  | Q.  You mentioned that lab earlier.  Down the line did you buy |
| 3  | that lab from Jamie McNamara? |
| 4  | A.  Yes, we did. |
| 5  | Q.  At this time, what was your arrangement with Jamie McNamara |
| 6  | and Signify? |
| 7  | A.  He would give us a hundred to $200,000 a week for signed |
| 8  | doctors' orders. |
| 9  | Q.  Are these for Medicare patients only? |
| 10 | A.  Only Medicare patients. |
| 11 | Q.  Do you know how much Signify was receiving from Medicare |
| 12 | for each test? |
| 13 | A.  Anywhere between 6 to 7, $8,000. |
| 14 | Q.  Would Signify pay you if Medicare did not reimburse them |
| 15 | for the order? |
| 16 | A.  No, they would not. |
| 17 | Q.  How do you know this? |
| 18 | A.  Because that was our deal, that was the deal I made with |
| 19 | Jamie. |
| 20 | Q.  Did this ever become an issue?  Did Mr. McNamara ever tell |
| 21 | you, hey, a couple pf your orders didn't come through? |
| 22 | A.  Of course. |
| 23 | Q.  Did that happen often? |
| 24 | A.  Weekly. |
| 25 | Q.  What would you do when that happened? |

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 88 of 180 88
53 of 104

1   A.   We would trash that order.  We would throw that order away

2   depending on what the reason was.  If it was something we could

3   fix, we would fix it.  If there was information wrong, a

4   billing code, we would fix that, but if the patient passed

5   away, we would run into that, we would throw the order away.

6   That was very seldom, but if it was just not a billable deal,

7   we would throw that order away, if they had supplemental

8   insurance or something like that.

9   Q.   What if you could make it a billable deal?

10  A.   How would we make it a billable deal?

11  Q.   It has come back now from Signify, it has come back to your

12  call center; how do you make it a billable deal?

13  A.   The managers would go back and change the information that

14  needed to be changed.

15  Q.   What managers?

16  A.   Jose Goyos, my brother, Louis Carver, Tim Richardson,

17  Ashley Sigaroa, Detally Fairweather.

18  Q.   Were they aware that these were kicked back they needed to

19  fix them?

20  A.   Yes.  They were aware before I would be aware sometimes.

21  Q.   Did you set quotas at that time for the call center to meet

22  each week to get a certain number of doctors' orders over to

23  Signify?

24  A.   At that time, at the telemedicine phase, we had to hit that

25  number every week.

Pauline A. Stipes, Official Federal Reporter

```
 1        (Loud thunder.)
 2             THE COURT:  Let's keep going.
 3             MR. QUEENAN:  Thank you, Judge.
 4   BY MR. QUEENAN:
 5   Q.  Now, what happened when you did not have enough doctors'
 6   orders from telemedicine back in time?
 7   A.  We would forge the orders.
 8   Q.  I think we covered this, but who was involved in that?
 9   A.  Same managers, Jose Goyos, Tim Richardson, my brother,
10   Louis Carver, Detally Fairweather.
11   Q.  Now, I want to jump ahead.  At some point you change your
12   business model, and you move to your own laboratories, correct?
13   A.  Yes, sir.
14   Q.  You mentioned who your partners were, and I want to focus
15   in on Cergena, Progenix and Theragene.  Okay?
16   A.  Okay.
17   Q.  How did you split the profits for Cergena?
18   A.  Equally among the partners.
19   Q.  Those partners were who again?
20   A.  For Cergena, it was myself, Thomas Dougherty, John Paul
21   Gosney, Jamie McNamara, Julio and John Trennon.
22   Q.  Where was Cergena located?
23   A.  Like the physical lab?  New Orleans.
24   Q.  Now, when you started, you purchased Cergena and you
25   started billing through Cergena, had you even traveled to New
```

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL    Document 994    Entered on FLSD Docket 01/27/2024    Page 90 of 180
55 of 104
90

 1    Orleans to see the lab?

 2    A.   No, we did not.

 3    Q.   Was anyone working out of there that contributed to the

 4    call center operation?

 5    A.   No.  We just knew it had an active billable license.

 6    Q.   Did Cergena run any tests?

 7    A.   No, it did not.

 8    Q.   How would they test it?

 9    A.   It got sent to a reference lab, I believe it was in

10    California and/or Texas, called Folgent Laboratories.

11    Q.   Now, did you have any financial interest in this company,

12    Folgent?

13    A.   No, I did not.

14    Q.   Separate company?

15    A.   Completely separate.

16    Q.   How much did you pay for each one of these tests run?

17    A.   $400 at first, and then eventually it went to $800.

18    Q.   When you were getting these tests run for $400, who is

19    billing Medicare?

20    A.   We were.

21    Q.   How much are you billing Medicare for these tests that you

22    paid 400 or $800 for?

23    A.   How much were we billing for or how much were we receiving?

24    Q.   Both.

25    A.   We would bill somewhere around the 7500 to $82100 area and

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 91 of 180

56 of 104

91

 1    we'd get around 6800 to $7,000 back.

 2    Q.  How did you determine -- how did you determine what you

 3    were going to bill for?  What was driving that?

 4    A.  Like what test was driving that?

 5    Q.  What test did you decide to run?

 6    A.  We only ran one test.

 7    Q.  Why did you pick that test?

 8    A.  Because it paid out so much.  It was the easiest test to

 9    get the patients to agree to, with the easiest symptoms.

10    Q.  Was this much more profitable than your prior campaigns?

11    A.  Yes.

12    Q.  Now, you mentioned that you partnered in additional labs.

13    Can you describe who you partnered with in Progenix?

14    A.  The same partners as Cergena, we added Michael and Galina

15    Rosenberg.  They became the straw owners, owners of that lab.

16    Q.  How about Theragene?

17    A.  Theragene was another lab we purchased from a group and

18    that was just myself, John Paul Gosney, and Thomas Dougherty.

19    Q.  For both of these labs, same questions with Cergena, did

20    they run any tests?

21    A.  No.  None of the labs we owned ever ran a test.

22    Q.  The same with process, you had Folgent do it, you paid them

23    a couple hundred bucks and then billed Medicare?

24    A.  Yes.

25    Q.  Now, were your partners, the Rosenbergs, aware you had

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
57 of 104
Case 9:22-cr-80022-DSL    Document 994    Entered on FLSD Docket 01/27/2024    Page 92 of 180

92

```
 1   another lab, Theragene?

 2   A.   No.

 3   Q.   Why was that?

 4   A.   We just didn't want so many partners in that lab.  We were

 5   making great money in Progenix and we wanted to open up another

 6   lab, we had excess business, and we just didn't have that many

 7   partners in that lab.

 8   Q.   Why did you have multiple labs?

 9   A.   We wanted to spread out the business.  We didn't want to

10   raise any red flags with Medicare by billing millions upon

11   millions of dollars weekly through just one lab that wasn't

12   running any tests, so we spread it out through other labs.

13   Q.   So, at one point, you are transitioning from selling

14   doctors' orders to Signify, now you are running your own labs.

15   Did you move away from telemedicine?

16   A.   Yes, we stopped doing telemedicine in whole.

17   Q.   Why?

18   A.   We knew telemedicine was -- we weren't supposed to do it,

19   so, when we -- we eventually stopped, and telemedicine wasn't

20   paying any more.  Medicare wasn't paying us for telemedicine

21   business.

22   Q.   Was there a lot more scrutiny on telemedicine?

23   A.   Oh yeah.

24   Q.   Were you worried about being detected?

25   A.   We were worried about everything from our labs being shut
```

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 93 of 180   93
58 of 104

```
 1    down an not making any money up until us getting arrested by
 2    the FBI or the Federal Government.
 3  Q.  Did you ever discuss this with Mr. Goyos?
 4  A.  Yes, we discussed it with Mr. Goyos.
 5  Q.  Give us an example.
 6  A.  We had these conversations.  Mr. Goyos, among other
 7    managers, he ran our Doctor Chase department, so we opened that
 8    department and he ran that department.  We would have
 9    conversations that telemed was illegal, and that we were going
10    to transition over to Doctor Chase, stuff of that nature.
11  Q.  Now, when did this occur, this transition?
12  A.  Summer of 2020.
13  Q.  How did you inform -- I guess who was involved in this
14    decision to transfer from telemed to Doc Chase?
15  A.  Myself, Thomas Dougherty, John Paul Gosney.  That is really
16    it.
17  Q.  Did you inform your managers?
18  A.  Yes, we had a manager meeting -- well, we had individual
19    meetings first.  We would talk to each manager by section of
20    the company, and then eventually we had one big management
21    meeting.
22  Q.  After that, did you have a meeting with your employees --
23    did this impact your entire business model?
24  A.  It did, yes.
25  Q.  What impact did it have on it?
```

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 94 of 180

94

1    A.  Well, we were kind of doing everything in house, and from

2    this point forward, we weren't going to have any outside down

3    lines really besides one or two, compared to the numerous ones

4    we had which were other offices, as well as we needed to clean

5    up the business on the front end so we could get more business

6    generated by the Doctor Chase department, if that makes sense.

7    Q.  Were you still running the cardiovascular campaign with

8    your sales group?

9    A.  Yes, we were.

10   Q.  Was the sales group running off the same sales scripts?

11   A.  Same call scripts, same data.

12   Q.  Were they receiving the same incentives?

13   A.  Yes, sir.

14   Q.  What changed was the way you scripted those orders, like

15   without a doctor's signature?

16   A.  We went from telemedicine to Doctor Chase.  We went from

17   setting up with a patient with a doctor that we were paying to

18   getting the order signed by their primary care physician.

19   Q.  Now, had you tried Doctor Chase before in any other

20   campaigns?

21   A.  We tried it in durable medical equipment.

22   Q.  Does it work in durable medical equipment?

23   A.  No, it does not.

24   Q.  Did you find that you could design a Doctor Chase campaign

25   that would work for genetic testing?

Pauline A. Stipes, Official Federal Reporter

```
 1   A.  Yes, we did.

 2   Q.  Now, can you explain how the return rate is in Doc Chase?

 3   You told us 99.9 percent for the telemed doctors.  How does it

 4   work for Doc Chase?

 5   A.  To make it like simple numbers, if you write a hundred

 6   deals, anywhere between 20 to 25 will come back, compared to we

 7   write a hundred deals in telemed, 99 come back.

 8   Q.  Now, because you move to a business model where you bill

 9   directly, does Doc Chase become profitable?

10   A.  Of course, yes.

11   Q.  Is that the reason why you moved to it?

12   A.  Yes, we moved to it for -- that is one of the reasons, yes.

13   Q.  What was Mr. Goyos' role with regard to Doc Chase?

14   A.  He was the manager, he ran the show.

15   Q.  Who else worked at Doc Chase?

16   A.  At first a girl named Alex Leon and Elizabeth Sara, and

17   then eventually the managers were Ethan Macier and Jose Goyos.

18   Q.  At some point, did Ethan Macier move on toward the end?

19   A.  Yes, he went to run his own office.

20   Q.  Did Mr. Goyos stay and run Doc Chase?

21   A.  Yes, we kept Mr. Goyos to stay and run Doc Chase, yes.

22   Q.  When is it, approximately, that Mr. Goyos starts as a

23   manager at Doc Chase?

24   A.  Probably maybe a couple weeks after we start, one month

25   after we start Doc Chase, pretty quickly.
```

```
 1   Q.   When is that?
 2   A.   Summer, 2020.
 3   Q.   How many telemarketing reps worked under Mr. Goyos and Doc
 4   Chase?
 5   A.   20 plus.
 6   Q.   And what types of things was Mr. Goyos involved in with
 7   regard to any aspects -- other aspects of the call center?
 8   A.   Well, not only -- he ran Doc Chase, but he wrote the
 9   scripts, he wrote the training manual for Doc Chase, he managed
10   it.  We even have to speak to the sales part of our call center
11   to make sure that the deals were written right so he could
12   chase them down the right way.
13   Q.   What was the goal for the Doc Chase department?
14   A.   To get as many doctors' signatures as possible.
15   Q.   Did Doc Chase reps lie and deceive doctors and doctors'
16   offices?
17   A.   Yes, they did.
18   Q.   How do you know that?
19   A.   I heard them.  I would hear recordings every once in
20   awhile -- not recordings, I would hear them talking, sorry.
21   That was the point, we had to deceive them, we had to
22   deceptively get them to think we were a lab they were working
23   with prior, or think that we were some type of -- you know, we
24   were part of the lab, so on and so forth.  We just had to
25   deceive them.
```

```
 1   Q.  What are some of the things you lied about?  You meaning

 2   the call center and call center reps at Doc Chase?

 3   A.  For the sales or just Doc Chase?

 4   Q.  Doc Chase.

 5   A.  We told them we were Gentec Solutions, which was a whole

 6   nother company, we just changed the name.  We weren't using

 7   Broad Street Lifestyles or Olympus first, we created a whole

 8   nother company to go under.  We would contact them as if the

 9   patient inquired for this test and really we reached out to

10   them and convinced them to take it.

11       We would say things without directly saying them, like make

12   them think they were a lab they worked with, kind of like, for

13   example, Lab Corp or Quest Diagnostics.  We would try to put

14   ourselves in that same realm as if we were some huge lab that

15   had been around for 20, 30 years.

16       The most important thing and most significant thing we were

17   doing was letting them think that the patient inquired about

18   this test.

19   Q.  Did you let them think that you were treating the patient?

20   Did you use language like mutual patient?

21   A.  Yes, we did.

22   Q.  Why is that important?

23   A.  Because it built that rapport with the doctor's office,

24   that we all had the same patient, were treating the same

25   patient, we were like a doctor's office, like a laboratory.
```

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
63 of 104
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 98 of 180 98

 1   Q.  You mentioned Gentec Solutions.  You said you created this

 2   company?

 3   A.  We created the name of the company first.  Yes.

 4   Q.  Did you ultimately file something with the Secretary of

 5   State for Gentec Solutions?

 6   A.  We filed something on the Secretary of State or Sunbiz.

 7   Q.  Did Gentec have any bank accounts?

 8   A.  No.

 9   Q.  Did it have any employees?

10   A.  No.

11   Q.  Did it have a separate office space or anything?

12   A.  No, it didn't.

13   Q.  Then why did you create Gentec?

14   A.  We just wanted to build kind of a separation between the

15   call center and the Doctor Chase for numerous reasons.

16   Q.  Why?

17   A.  Well, there is a lot of lash, like kickback on the call

18   center, you get a lot of complaints, a lot of people call in.

19   A lot of people find out the name of the company, and we wanted

20   to build that division so it doesn't roll over on the Doctor

21   Chase department.

22        For example, simple things like the call center, we kept

23   them separate.  The call center was super loud, very salesy

24   music, whatever.  Doctor Chase was very quiet, I don't want to

25   say educated, but it was a little bit more educated reps that

```
 1    could talk to different doctors, stuff like that.
 2    Q.  Did Gentec have a website at some point?
 3    A.  Eventually we created a website, yes.
 4    Q.  Who was involved in creating that website?
 5    A.  John Paul Gosney and Jose Goyos.
 6    Q.  What was the purpose of creating a website for this company
 7    that didn't have a function?
 8    A.  Just to get more signatures from the doctors.
 9    Q.  How would a website result in more signatures?
10    A.  When you are doing telemarketing, like sales or campaigns,
11    it is all deception, so if the doctors say, who are you guys,
12    hold on, let me bring you to my website.  It veers them off
13    into looking at something else.
14    Q.  Now, you mentioned that at some point you moved into a
15    bigger space and Doc Chase came in house with the rest of the
16    call center.  Did you still keep them separate so it was quiet?
17    A.  Yes.  We rented a very big space and made sure there was a
18    big separation between the two.
19    Q.  Was it all on the same floor?
20    A.  Yes.
21    Q.  Was this around December of 2020?
22    A.  Yes, it was.
23    Q.  I would like to show you Government Exhibit 808.
24        I believe already admitted, your Honor.
25        What are we looking at here?
```

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 100 of
180
100

```
 1    A.   This was the Doctor Chase department.

 2    Q.   Now, before you were shut down by Federal law enforcement

 3    agents, was it empty like this?

 4    A.   No.  It was packed with representatives, employees.

 5    Q.   What is hanging on the wall there?

 6    A.   A TV.

 7    Q.   What was broadcast on that TV during the day?

 8    A.   The numbers of the representatives, how many signatures

 9    they received.

10    Q.   Meaning how many signed doctors' orders each rep received?

11    A.   Yes, sir.

12    Q.   Why would you keep that published up on the floor?

13    A.   Because we would incentivize them to get as many as they

14    can by cash bonuses, and the employees that got the most got to

15    receive cash bonuses.

16    Q.   The employees who got the most doctor's signatures were

17    allowed to get cash bonuses?

18    A.   Yes, in many different ways.

19    Q.   Does that sound like medicine to you?

20    A.   No.  It was far from medicine.

21    Q.   Could we see Government Exhibit 810.

22         What are we looking at here?

23    A.   This was -- it is the same office, just from a different

24    angle.

25    Q.   Where did Jose Goyos sit?
```

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 101 of
180
101
66 of 104

```
 1   A.  I believe that was his desk right here.  (Indicating.)
 2   This one we are looking at, the left one, not the right one.
 3   Q.  Did he sit on the floor with the Doc Chase reps?
 4   A.  Yes, he did.
 5   Q.  What is that beyond his cubicle against the wall?
 6   A.  The wheel.
 7   Q.  What is the wheel?
 8   A.  It is a money wheel.
 9   Q.  I would like to show you Government's Exhibit 902 already
10   admitted.  Can you see this exhibit over here, Mr. Carver?
11   A.  Yes, sir.
12   Q.  Is that the money wheel from the Doc Chase unit?
13   A.  It is, sir, yes.
14   Q.  Now, when was a rep able to spin that wheel?
15   A.  As soon as he hit a certain amount of signatures, Jose
16   would let them know -- like Jose would set the precedence of
17   how many signatures they would have to get to spin that wheel.
18   Q.  Did you guys run different incentives all the time?
19   A.  Yes.  Sometimes we would go and we would give money to Jose
20   or he would come to us and say he wanted to run a cash spiff
21   that day, and we would do it that way, as well as the wheel.
22   Q.  Now, where did many of your telemarketing reps come from?
23   Where did you recruit them from?
24   A.  They were either felons or ex drug addicts.
25   Q.  Thank you on the picture.
```

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 102 of 102
180

1     I want to jump back for a minute and talk about the

2  transition from Signify to Cergena.  At some point, did Signify

3  tell you they were done doing business?

4  A.  They did, yes.

5  Q.  Had you generated doctors' orders that you intended to sell

6  to Signify?

7  A.  Yes, lots.

8  Q.  Now you didn't have a buyer?

9  A.  We didn't have anybody to sell them to, no.

10 Q.  When you say lots, how many did you have in this backlog of

11 doctors' orders?

12 A.  Under a thousand, 500.

13 Q.  What did you intend to do with these?

14 A.  We weren't going to throw them away, we spent so much money

15 acquiring them, we knew that they were worth so much money, so

16 we eventually Doctor Chased them and put them on a different

17 lab requisition form.  We kept the same patient information and

18 we changed the lab name and the lab billing, which is called a

19 Clea (phon) number, and we put it so we could bill it through

20 our lab that we just acquired.

21 Q.  Let me break it down.  You have how many orders?

22 A.  500 to -- just under a thousand.

23 Q.  So these are already signed by a patient and already signed

24 by a telemedicine doctor and they are for Signify, correct?

25 A.  Yes, and they are swabbed, we had the physical swabs back.

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
68 of 104
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 103 of 180   103

1    *Q.*  How did you get it on to a different order and get rid of

2    that doctor's signature?

3    *A.*  I believe we put it in PDF filler or zoho sign, and we

4    literally cut off the top of the order and put it in a

5    different lab.

6    *Q.*  Was this a big project?

7    *A.*  Yes, sure, very big.

8    *Q.*  Who was involved in migrating these doctor's orders to a

9    separate lab requisition form?

10   *A.*  The manager for the lab department, really just the lab

11   department, Jose Goyos, Ashley Sigaroa, Detally Fairweather,

12   Tim Richardson helped on it, my brother, I believe.

13   *Q.*  Who chased the orders with the doctors after?

14   *A.*  The Doctor Chase department.

15   *Q.*  Was that Jose Goyos' department?

16   *A.*  Yes, it was.

17   *Q.*  Did you ultimately bill this chunk of orders through

18   Cergena, your new lab?

19   *A.*  Yes, we did.

20   *Q.*  How far involved -- how far along in the process did you

21   bill them?

22   *A.*  What do you mean?

23   *Q.*  Was this your first batch that you were going to bill?

24   *A.*  Yes, these were our first orders that we processed through

25   our first lab.

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 104 of 104
180

```
 1   Q.  Did you successfully get paid from Medicare?

 2   A.  Yes, we did.

 3   Q.  Approximately when?

 4   A.  I want to say September to October of 2020.

 5   Q.  This would be the first payment you received from Medicare

 6   from Cergena?

 7   A.  Yes, we called it a drop, our first drop.

 8   Q.  What does a drop mean?

 9   A.  When Medicare would drop money into our account.

10   Q.  Where were you when you first got these first drops?

11   A.  Well, we did a test drop, we were in Florida, but

12   eventually we were in California when all the money came in.

13   Q.  When you say all the money, how much money are we talking

14   about?

15   A.  Millions of dollars.

16   Q.  When you say we were in California, who was in California?

17   A.  Myself, I was with my ex-wife at the time, my brother, and

18   Jose Goyos was there.

19   Q.  Just the four of you?

20   A.  Just the four of us.

21   Q.  And this is your brother who is the straw owner who

22   partnered up in the lab and worked with Jose Goyos in that

23   aspect, right?

24   A.  Yes, sir.

25   Q.  What was the purpose of the trip?
```

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 105 of 105
180

```
 1   A.  Leisure, vacation.

 2          MR. QUEENAN:  Just one moment, your Honor.

 3   BY MR. QUEENAN:

 4   Q.  I would like to show you what is marked as Government

 5   exhibit 2301.

 6          MR. QUEENAN:  Could I have the ELMO, please.

 7          May I approach the witness, your Honor?

 8          THE COURT:  Yes.

 9   BY MR. QUEENAN:

10   Q.  Mr. Carver, can you take a moment to review that document?

11          THE COURT:  What is the number?

12          MR. QUEENAN:  2301.  Your Honor, this was stickered

13   this morning and provided to Defense counsel.

14          THE COURT:  Okay.

15   BY MR. QUEENAN:

16   Q.  Do you recognize that document?

17   A.  Yes, sir.

18   Q.  What do you recognize it to be?

19   A.  This is a flight itinerary to California.

20   Q.  Is it an email?

21   A.  Yes, sir.

22   Q.  Who is the email from?

23   A.  It's from Jose Goyos to myself.

24   Q.  What is the date?

25   A.  October 16, 2020.
```

**Pauline A. Stipes, Official Federal Reporter**

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
106
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 106 of
180

1          MR. QUEENAN:  Your Honor, the Government moves to

2     admit 2301.

3          THE COURT:  Any objection?

4          MS. McCRAE:  No objection.

5          THE COURT:  All right.  Government's 2301 is admitted

6     without objection.

7       (Whereupon Government Exhibit 2301 was marked for

8     evidence.)

9          MR. QUEENAN:  I would like to publish through the

10    ELMO, please, your Honor.

11    BY MR. QUEENAN:

12    Q.  Okay.  Mr. Carver, the jury can see this for the first time

13    now.  Can you walk us through the header?

14    A.  It's from Jose Goyos to Danny Carver, and the subject is

15    Jet Blue booking confirmation for Jose Manuel Goyos on October

16    16, 2020.

17    Q.  Is this email forwarded from Jet Blue reservations?

18    A.  It is.

19    Q.  If I turn to page three, is this the itinerary for Mr.

20    Goyos to go to Los Angeles?

21    A.  It is, yes.

22    Q.  Is he scheduled to go out from Fort Lauderdale to LAX on

23    October 17, 2020?

24    A.  Yes.

25    Q.  And is he scheduled to return from LAX to Fort Lauderdale

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   72 of 104   on FLSD Docket 01/27/2024   Page 107 of 107
180

```
 1   that Monday, October 19th?

 2   A.  Yes, he was.

 3   Q.  Are these the dates that you were with Mr. Goyos in

 4   California?

 5   A.  Yes, I was.

 6   Q.  Now, was Mr. Goyos with you when you got the drop or drops

 7   of millions of dollars?

 8   A.  He was, yes.

 9   Q.  Was he aware?

10   A.  Yes, he was.

11   Q.  How was he aware that you just got these drops of millions

12   of dollars?

13   A.  Well, we were very excited and I showed him via the phone

14   the banking app.

15   Q.  Did you celebrate?

16   A.  Yes, we did.

17   Q.  What did you guys do?

18   A.  I believe that day we were supposed to go to the Hollywood

19   sign, and instead we went to jewelry stores and designer

20   stores.

21   Q.  Did you buy any jewelry?

22   A.  Yes, we did.

23   Q.  Approximately how much money did you spend on jewelry?

24   A.  Hundreds of thousands of dollars.

25   Q.  How much did you spend at designer clothes stores?
```

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994   73 of 104 on FLSD Docket 01/27/2024   Page 108 of 108
180

```
 1   A.  Five figures, ten grand, 20,000, somewhere around there.

 2   Q.  Now, most of the jewelry, who did you buy it for?

 3   A.  Myself and my ex-wife.  We did purchase jewelry for my

 4   brother, and I believe Jose got something as well.

 5   Q.  Meaning you bought Jose a piece of jewelry?

 6   A.  Yeah.

 7   Q.  How much was that?

 8   A.  I think it was 500 bucks, something like that.

 9   Q.  Did you take Mr. Goyos shopping as well?

10   A.  Yes, we did.

11   Q.  Did you buy him anything in shopping?

12   A.  Designer clothes, yes.

13   Q.  Did you guys go out that night?

14   A.  Yes, we did.

15   Q.  Did you cover basically all the expenses for this trip for

16   your manager, Mr. Goyos?

17   A.  I covered everything from the airfare to food, clothes,

18   hotel room, everything.

19        MR. QUEENAN:  Your Honor, I would like to approach the

20   witness with what has been marked for identification as

21   Government 2302.

22        THE COURT:  All right.

23   BY MR. QUEENAN:

24   Q.  Mr. Carver, do you recognize that document?

25   A.  Yes.
```

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   74 of 104   Entered on FLSD Docket 01/27/2024   Page 109 of 109
180

1   Q.  What do you recognize it to be?

2   A.  It's my Chase bank statement, that was my personal banking

3   information.

4   Q.  What month is that bank statement for?

5   A.  October.

6   Q.  2020?

7   A.  2020.

8   Q.  The time you were out in California?

9   A.  Yes, sir.

10  Q.  Did you have a debit card or credit card associated with

11  that account?

12  A.  Yes.

13  Q.  Did you use that card in California for some of the

14  expenses we were talking about?

15  A.  Basically all the expenses.

16  Q.  Did you have any cash with you?

17  A.  I did, yes.

18  Q.  How much cash did you fly out to California with?

19  A.  Maybe around 20 grand, 30 grand.

20  Q.  Twenty, or 30 grand?

21  A.  Yes.

22       MR. QUEENAN:  Your Honor, I move to admit Government

23  Exhibit 2302.

24       THE COURT:  Any objection?

25       MS. McCRAE:  No, your Honor.

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 110 of 110
180

1          *THE COURT:*  **2302 is admitted without objection.**

2          (Whereupon Government Exhibit 2302 was marked for

3      evidence.)

4      *BY MR. QUEENAN:*

5      *Q.*  **I would like to draw your attention to some purchases on**

6      **the 19th.  As you see here, there is a lot of Los Angeles,**

7      **California.  Is that where you were with Mr. Goyos?**

8      *A.*  **Yes, sir.**

9      *Q.*  **Now, on October 19th, Nova Gold Imports Los Angeles,**

10     **$30,374, what was that for?**

11     *A.*  **A gold chain.**

12     *Q.*  **Dolce & Gabbana Beverly Hills, $3,252, what was that for?**

13     *A.*  **That was for a clothing store.**

14     *Q.*  **Do you recall making purchases out there that day after you**

15     **got the drop?**

16     *A.*  **Yes.**

17     *Q.*  **Were some of these purchases made when you were with Jose**

18     **Goyos?**

19     *A.*  **Yes, he was with us the whole time.**

20     *Q.*  **Now, I am going to switch gears for a minute.**

21          **Earlier you had talked about how there were recordings at**

22     **the call center, that you recorded the sales case.**

23          **Did you have a vendor, did you pay someone to house those**

24     **recordings and make those recordings?**

25     *A.*  **Yes, we paid Telesero.**

**Pauline A. Stipes, Official Federal Reporter**

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL    Document 994    Entered on FLSD Docket 01/27/2024    Page 111 of
180
76 of 104
111

```
 1   Q.  What services did you pay Telesero for?

 2   A.  They were the predictive dialer for the phone calls, as

 3   well as they stored all of the recordings for the calls.

 4          MR. QUEENAN:  Can we switch to -- your Honor, there

 5   may be a monitor out.  When the monitors come on, could we

 6   check with the jury to make sure they --

 7   BY MR. QUEENAN:

 8   Q.  I would like to play for you a recording --

 9          MR. QUEENAN:  One moment, your Honor.  Just one

10   moment, your Honor, I apologize.

11   BY MR. QUEENAN:

12   Q.  Mr. Carver, prior to your testimony, were you able to

13   listen to any recordings from Telesero?

14   A.  Yes, I was.

15   Q.  Did the Government play a recording regarding a beneficiary

16   named Charlotte Copeland?

17   A.  Yes.

18   Q.  Did you review that recording earlier today?

19   A.  I did, yes.

20          MR. QUEENAN:  Your Honor, I would like to show the

21   witness what has been marked as Government's Exhibits 2003-A

22   and B.

23   BY MR. QUEENAN:

24   Q.  Mr. Carver, do you see this?

25   A.  Yes, I can.
```

**Pauline A. Stipes, Official Federal Reporter**

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994  77 of 104 on FLSD Docket 01/27/2024   Page 112 of 112
180

1    *Q.*  **Do you recognize this item?**

2    *A.*  **Yes, this is what I signed earlier.**

3    *Q.*  **What is contained on this CD 2003-A and B?**

4    *A.*  **A recording of -- from the call center of an employee of**

5    **mine.**

6    *Q.*  **Are there two recordings?**

7    *A.*  **Yes.**

8           *MR. QUEENAN:*  **Your Honor, the Government moves to**

9    **admit 2003-A and B, and their accompanying transcripts 2003-AA**

10   **and 2003-BB.**

11          *MS. McCRAE:*  **May we approach, your Honor?**

12          *THE COURT:*  **Okay.**

13          **(Thereupon, the following sidebar proceedings were**

14   **had.)**

15          *MS. McCRAE:*  **Your Honor, I would object to the**

16   **admission of these recordings and transcripts under hearsay and**

17   **confrontation clause grounds and 403.  It's a short recording**

18   **and this woman who identifies herself as Charlotte Copeland,**

19   **who is not going to be called as a witness in this case, is**

20   **going to say her husband, who also is not going to be a witness**

21   **in this case, talked to her doctor, who also is not going to be**

22   **called as a witness in this case, yesterday.  And the doctor**

23   **told this person on the call that she, the doctor, did not sign**

24   **the order, and the woman says, I feel like you all lied to me.**

25          **And there is an extended conversation between this**

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
78 of 104
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 113 of 113
180

```
 1    woman who is not going to testify about whether the doctor's

 2    order was forged.

 3            And in the second call, I talked to my doctor

 4    yesterday, and she didn't sign anything, don't send me the back

 5    brace.

 6            We are not talking about the lab test or -- we are

 7    talking about DME in these calls, and this is the part of the

 8    case against Mr. Goyos that the Government abandoned and

 9    dismissed.

10            THE COURT:  This is still part of the conspiracy.

11    What is your response, if any?

12            MR. QUEENAN:  I want to check on the date.  If it does

13    predate, June --

14            THE COURT:  Why are these issues being raised to me

15    right now?  These are substantive issues that require thinking

16    and discussion.  I am not handling these matters at sidebar.

17            What do you need?

18            MR. QUEENAN:  I need one moment, your Honor.

19            THE COURT:  To check what?

20            MR. QUEENAN:  To check the date of the phone call.

21            THE COURT:  Okay, go and check and come back.

22            MR. QUEENAN:  Thank you.

23            (Pause)

24            December 2020, during the time Jose Goyos was in the

25    conspiracy.  This is one of his co-conspirators, Johnny Hughes,
```

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 114 of 114
180
79 of 104

```
 1    one of the managers.  This is a call -- she may say brace at
 2    the end, but this is a kit chase call.  It is statements by a
 3    co-conspirator, it is literally the crime being committed as
 4    they are trying to lie to these patients and hearing the
 5    rebuttals.  It is highly probative.
 6              MS. McCRAE:  Your Honor, the issue -- there are
 7    multiple issues, right.  One is, we are admitting this assuming
 8    that Mr. Goyos was engaged in the conspiracy with Mr. Hughes.
 9    I don't believe Mr. Hughes is going to be called to testify, or
10    we heard enough testimony to link up Mr. Goyos with Mr.
11    Hughes, that they are a part of one conspiracy, as opposed to
12    other conspiracies.
13              At the end of the day, there is nothing to give us
14    that date, it is not apparent in the transcript or recording,
15    and I don't think this witness has personal knowledge to date
16    it.  Once again, like this witness testified about a half
17    million recordings that the Government can choose from, they
18    are only picking and choosing certain ones.  There are plenty
19    of recordings they could --
20              THE COURT:  This one appears to be highly probative
21    because of the contents, I can understand why the Government
22    wants to use it.  What is your basis of introduction?
23              MR. QUEENAN:  Co-conspirator, in furtherance of the
24    conspiracy.  We are not -- you are capturing this in real time,
25    the call itself is not hearsay.  I appreciate counsel's
```

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 115 of
180
115

 1    arguments, those are great arguments as to its weight.  All of

 2    those will be argued in closing argument, we cherry picked

 3    these, that doesn't go to the admissibility.

 4         MS. McCRAE:  Your Honor, it does, to admit them and

 5    allow them to claim they are doing it not for the truth of what

 6    this witness says, they have 499,000 other ones to choose from,

 7    they are solely picking this one because this woman is telling

 8    us what her husband said and the doctor said.

 9         THE COURT:  You can cherry pick those questions out.

10    I am not seeing a legal basis to exclude this information, it

11    does appear it falls within the exception of the co-conspirator

12    rule.  If there is an issue in the linking for purposes of 801,

13    then you can re-raise that later, and I can make a decision

14    after the fact with regard to potentially advising the jury,

15    but for now, I am satisfied there is a sufficient evidentiary

16    basis to admit the call -- two calls and two transcripts.

17         MR. QUEENAN:  Yes, a call and --

18         THE COURT:  You can raise this in the form of an

19    802(d) argument.  I haven't --

20         MS. McCRAE:  I would ask for a cautionary instruction

21    to the jury that they are not to take the statements made by

22    the beneficiary of the caller for the truth of the matter, they

23    are being admitted for the purpose of the call center

24    statement.  They are not to infer that the statement on the

25    call is true.

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
116
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 116 of
180

1            MR. QUEENAN:  That is fair.

2            THE COURT:  If that is an instruction it would have

3    been needed to be used in the other recordings.

4            I don't want to create an inconsistent treatment

5    vis-a-vis these calls.  These are substantive issues.  How much

6    longer do you have with this witness?

7            MR. QUEENAN:  30, 40 minutes, maybe less.

8            THE COURT:  What we will do is skip over this.  Get

9    through as much as you can, then we'll break and discuss this

10   and finish your direct on Monday.

11           MR. QUEENAN:  Okay, I hear you.

12       (Thereupon, the sidebar proceedings concluded.)

13   BY MR. QUEENAN:

14   Q.  Mr. Carver, we are going to come back to that later.

15       Did the call center receive complaints from patients at

16   all?

17   A.  Yes, they did.

18   Q.  Did they receive complaints from doctors?

19   A.  Yes.

20   Q.  What is the flavor of some of the complaints that the call

21   center received?

22   A.  This is a scam, you are not Medicare, I was lied to, I am

23   not taking this, this is fraud, stuff like that.

24   Q.  Now, where did these complaints, when you would receive

25   them -- let's start with doctors.  Who would receive these

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL    Document 994    82 of 104 on FLSD Docket 01/27/2024    Page 117 of 117
180

```
 1    complaints when they came in from doctors?
 2    A.   Jose Goyos and the managers.
 3    Q.   Why would a doctor complaint come in to Jose Goyos?
 4    A.   He ran that department.
 5    Q.   How would a doctor know to reach Jose Goyos?
 6    A.   Well, it was usually -- if it was via the computer, he
 7    would receive a master email in the CRM, something like that.
 8    Q.   Who else at the call center handled complaints?
 9    A.   Well, we -- I mean, it would go from -- it would be Jose
10    Goyos, sometimes the lab owner, which would be Galina Rosenberg
11    handled it.  We had given it to our -- a gentleman by the name
12    of Keith Fousek, he was an attorney that worked with us in our
13    office.
14    Q.   Do you remember some of the complaints went to those shell
15    lab locations that you talked about?
16    A.   Sometimes they did, yes.
17    Q.   Where was Progenix located, the physical office?
18    A.   The physical office, Texas.
19    Q.   Was it a lab?
20    A.   No.
21    Q.   What was inside Progenix' office?
22    A.   A chair, microwave, maybe a fold out table.
23    Q.   Did Progenix receive complaints as well from patients?
24    A.   It did, yes.
25    Q.   I want to show you what has been marked for identification
```

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   83 of 104   on FLSD Docket 01/27/2024   Page 118 of 118
180

```
 1   as Government Exhibits 1002 and 1002-A.
 2            MR. QUEENAN:  Could we publish to the witness.   Thank
 3   you.
 4   BY MR. QUEENAN:
 5   Q.  Start with 1002, do you recognize this document?
 6   A.  I do, yes.
 7   Q.  What do you recognize that document to be?
 8   A.  An email.
 9   Q.  Who is the email from?
10   A.  Galina Rosenberg.
11   Q.  Is she your partner at Progenix?
12   A.  Yes, she is.
13   Q.  Who is it to?
14   A.  Myself and Ashley Sigaroa.
15   Q.  What is the date?
16   A.  June 30, 2021.
17   Q.  So, a few weeks before your call center is raided?
18   A.  Yes.
19   Q.  And what is attached to this email?
20   A.  A letter.
21   Q.  If you look at 1002-A -- show him the multi pages of that
22   document.
23       Do you recognize this attachment?
24   A.  I do, yes.
25   Q.  What do you recognize it to be?
```

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 119 of 119
180

1    *A.*  It's the physical swab that we would send to the patient,

2    as well as I believe a letter from another agency of Texas.

3         *MR. QUEENAN:*  Your Honor, at this time we move to

4    admit Government's Exhibit 1002 and 1002-A into evidence.

5         *THE COURT:*  Any objection?

6         *MS. McCRAE:*  I would ask the Court to conditionally

7    admit them under 801(d)(2)(E) subject to subsequent proof.

8         *MR. QUEENAN:*  Your Honor, we are moving to admit them

9    as to the affect on the listener.

10         *THE COURT:*  All right.  1002 and 1002-A?

11         *MR. QUEENAN:*  Yes, your Honor.

12         *THE COURT:*  All right.  I will see the parties at

13   sidebar.

14         (Thereupon, the following sidebar proceedings were

15   had:)

16         *THE COURT:*  If these are statements by a

17   co-conspirator, why do you need it?

18         *MR. QUEENAN:*  The letter itself is from a complaining

19   patient and husband received in two ways, email and the guy

20   also shipped it back, and it was brought it up at a manager's

21   meeting Jose was at.  They discussed this complaint at a

22   manager's meeting, allegations they are running a fraud scheme,

23   putting knowledge in their head.

24         *THE COURT:*  What instruction do you want to tell the

25   jury, not to consider the substance in the context of the

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL    Document 994    85 of 104    on FLSD Docket 01/27/2024    Page 120 of 120
180

1    complaint itself?

2         MR. QUEENAN:  They were put on notice that someone was

3    running a fraud, it goes to the heart of their intent.

4         THE COURT:  Where can I see the actual substance of

5    the complaint?

6         MR. QUEENAN:  Yes, your Honor, on page two.

7         They unluckily called the wife of like the senior

8    Medicaid fraud division in Texas.

9         THE COURT:  And so, the listeners would be who?

10         MR. QUEENAN:  Everyone at the manager's meeting, Jose

11    Goyos was one of the listeners.

12         THE COURT:  I think that it can come in not for the

13    truth of the contents in the complaint, but only for the effect

14    the complaint had on the listeners.  I assume that includes

15    Daniel Carver and the Defendant.

16         MS. McCRAE:  The Defendant is not on the email or

17    exhibit.  It would be in the testimony that would follow it.

18         MR. QUEENAN:  Yes.

19         (Thereupon, the sidebar concluded.)

20         THE COURT:  All right.  Ladies and gentlemen,

21    Government Exhibits -- what are the numbers again, 1002 and

22    1002-A.

23         MR. QUEENAN:  Yes, Judge.

24         THE COURT:  These exhibits are admitted, but ladies

25    and gentlemen, you are not to consider the substance of the

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   86 of 104 on FLSD Docket 01/27/2024   Page 121 of 121
180

 1   complaints therein for the truth of the matter in those

 2   complaints.  You should consider them only for the effect the

 3   complaints had on the listeners or receivers of those

 4   complaints.

 5        Please proceed.

 6        MR. QUEENAN:  Thank you, Judge.

 7   BY MR. QUEENAN:

 8   Q.  I am looking at 1002.  Mr. Carver, can you orient the jury

 9   to what you were reviewing earlier?

10   A.  It is an email from Galina Rosenberg to myself and Ashley

11   Sigaroa, June 30, 2021.

12   Q.  Let's look at 1002-A.

13   A.  Okay.

14   Q.  This first page, what is this?

15   A.  This is a complaint or a header from Gary W. Luft, Deputy

16   Executive Director for Health and Human Services.

17   Q.  Go to page two, please.

18        Who is this letter directed to?

19   A.  To our call center, our lab.

20   Q.  It says Leann Grossberg, Medical Director of Progenix.  Who

21   is that?

22   A.  She is the medical director for our laboratory.

23   Q.  When you say she is the medical director, what did she do

24   for your lab?

25   A.  Nothing.

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 122 of
180

```
 1    Q.   So, did you need to have a medical director listed on
 2    Medicare paperwork to get approved?
 3    A.   Yes.  We would need to have a medical director listed and
 4    we would pay them a salary for their name.
 5    Q.   Do you recall receiving this complaint?
 6    A.   I remember it, yes.
 7    Q.   How many ways did you receive it?
 8    A.   Email, they printed it out, brought it to me, a few ways.
 9    Q.   Now, did you -- when you printed this complaint out, did
10    you bring it to anyone else's attention?
11    A.   Yes, I brought it to the managers directly, and then we
12    brought it up in the manager's meeting as well.
13    Q.   This letter was brought up in a manager's meeting?
14    A.   Yes.
15    Q.   Was Mr. Goyos at that manager's meeting?
16    A.   Yes, he was.
17    Q.   Can you read the letter to the jury?
18    A.   Sure.  "I am returning your genetic testing swab unopened
19    which was sent to my wife, Bonnie Luft, as part of a telephone
20    solicitation on June 16, 2021 by your firm or someone with whom
21    you are associated.
22         "Bonnie Luft will not be participating in this genetic test
23    and she tried to contact your associates on two occasions on
24    June 21, 2021, to advise them, but no one answered the phone or
25    returned her message.  Numbers called were 281-909-7049, and
```

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
88 of 104
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 123 of 180

1    833-817-5188.   The telephone solicitation to my wife's cell

2    phone took place on June 16, 2021, and the caller, woman, had

3    my wife's Medicare number and read it to her.

4        "The caller was clearly implying that they were from

5    Medicare and gave the perception that it was a legitimate call.

6    Your solicitor explained that Medicare would pay for the

7    genetic testing and asked if Bonnie was interested.   Bonnie

8    responded yes, and the call was handed off to a man who

9    explained more about the testing.

10       "Attached are copies of the FedEx label in which the test

11   was sent to my wife, a copy of the USPS priority mail package

12   in which the completed sample was to be returned to Boca Raton,

13   Florida.   Also included are copies, the included in the packet

14   and a photocopy of the unopened test tube, number

15   41210551901905, which I am retaining as evidence that Bonnie

16   Luft did not participate in the test.

17       "I am not sending the unopened kit back to Florida or any

18   communication with them.   Instead, I am advising you that I am

19   notifying appropriate authorities of your operations.   Scams

20   such as this and anyone or any party participating in such a

21   scam should be held accountable by appropriate authorities.

22   Therefore, I am forwarding a copy of this letter to Medicare

23   CMS, the senior Medicare patrol program in Texas, and the

24   Attorney General of Texas because of the nature of this

25   solicitation and the clear misrepresentation to unknowing

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   89 of 104   on FLSD Docket 01/27/2024   Page 124 of 124
180

| 1 | seniors, resulting in costs to them and to CMS.  Respectfully." |
| 2 | Q.  Thank you? |
| 3 | MR. QUEENAN:  Can you show the witness two -- 1002-A. |
| 4 | I believe he skipped over a few paragraphs, so just show him |
| 5 | one exhibit, get it out of the dual screen. |
| 6 | Just one moment, your Honor. |
| 7 | BY MR. QUEENAN: |
| 8 | Q.  If you could read these three paragraphs here.  I think you |
| 9 | skipped over them.  That's our fault. |
| 10 | A.  "I am the Deputy Executive Director for Health and Human |
| 11 | Services for the Heart of Texas Council Governments.  We help |
| 12 | administer the Senior Medicare Patrol Fraud Program as part of |
| 13 | our area agency on aging in our six counties, and I am fully |
| 14 | aware that such a solicitation and tactics are scam oriented |
| 15 | toward unknowing seniors. |
| 16 | "I am also knowledgeable that Medicare does not authorize |
| 17 | payment for genetic testing unless under very specific |
| 18 | conditions and the cost of the expensive tests, sometimes as |
| 19 | much as a thousand dollars or more, is then passed on to an |
| 20 | unknowing senior who is led to believe it would be covered by |
| 21 | Medicare.  Hence the scam and anyone or any part participating |
| 22 | in such a scam should be held accountable by appropriate |
| 23 | authorities. |
| 24 | "Genetic testing is a valuable testing mechanism for those |
| 25 | who need it and have gone through their physician for |

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 125 of 125
180

1    appropriate consultation.  In this case, that did not happen

2    and my wife was duped into thinking it was a legitimate call

3    from Medicare.

4        "After talking with me and explaining what had happened, I

5    advised her to call our physician's office, Dr. David Myers,

6    and advise them of the call.  She immediately called them and

7    discussed the telephone solicitation and advised them that a

8    request would be coming from your firm and not to approve it,

9    because Bonnie did not want to participate and that she

10   believed it to be a scam.  They said they had many such

11   requests and would not approve them and would destroy the

12   requests.

13       "In spite of the conversation with the doctor's office, the

14   test was signed off in error by Dr. Myers and the kit was sent

15   to my wife which she received by FedEx on June 21, 2021.

16   Bonnie received the kit and we are returning it unopened and

17   unused with the clear understanding we do not want to

18   participate in the genetic test."

19   Q.  Your call center received this complaint, you printed it

20   out and you brought it to a managers meeting?

21   A.  Yes, we did.

22   Q.  Did you discuss it with the other managers and Jose Goyos?

23   A.  Yes, sir.

24   Q.  Why did you bring this up at the managers meetings?

25   A.  We always would bring up the complaints to figure out a way

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 126 of
180

1    to get around them, so we wanted to bring it to the managers'

2    attention.

3    Q.  Did you stop doing Doc Chase -- did you stop making these

4    calls after you got this letter?

5    A.  No.  No, we did not.

6    Q.  Did Jose Goyos report to the call center the next day and

7    the next however many working days there were between this and

8    the raid?

9    A.  Yes, he did.

10   Q.  I want to switch gears.  I only have a few more lines of

11   questioning for you, Mr. Carver.

12       Are you familiar with Tony's Deli?

13   A.  I am, yes.

14   Q.  What is Tony's Deli?

15   A.  Like a mini market, bodega and check cashing store in

16   Delray Beach, Florida.

17   Q.  In November 2020, among other months, did you cash checks

18   at Tony's Deli?

19   A.  Yes, I did.

20   Q.  Now, you mentioned earlier in your testimony one of your

21   partners in Cergena was someone named Jamie McNamara.  Could

22   you remind the jury who that is?

23   A.  Jamie McNamara was the gentleman that was the owner of the

24   laboratories we would sell business to, as well as who sold us

25   our labs.  He is the one who taught us the lab business.

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 127 of
180
127

```
 1   Q.   Did he own Signify?

 2   A.   Among other labs, yes.

 3   Q.   Did you purchase Cergena from him?

 4   A.   I did, yes.

 5   Q.   What was your partnership arrangement with him in Cergena?

 6   A.   That I would pay him in cash weekly a percentage of how

 7   much business we generated and billed through Cergena.

 8   Q.   Did you fall behind in those payments?

 9   A.   Yes, we did.

10   Q.   During this time period, did you pay Jamie McNamara cash?

11   A.   Yes.  That is why we fell behind, yes.

12   Q.   How much cash did you pay to Jamie McNamara?

13   A.   Millions of dollars.

14   Q.   How much is the most cash you paid to Jamie McNamara in one

15   transaction?

16   A.   Maybe 2 million bucks.

17   Q.   $2 million cash, and where was Jamie McNamara?

18   A.   For that particular payment, Kansas City.

19   Q.   How did you get $2 million cash to Kansas City?

20   A.   I flew it on a private jet.

21   Q.   Let's step back.  How did you get $2,000,000 cash?

22   A.   Through Tony's Deli and through drug dealers on the street.

23   Q.   I want to focus on Tony's Deli.  Approximately how much

24   money do you think you pulled out of Tony's Deli?

25   A.   Like over the whole time I have ever dealt with them?
```

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL    Document 994    Entered on FLSD Docket 01/27/2024    Page 128 of 128
180

```
 1    Q.   Just for purposes of paying Mr. McNamara.

 2    A.   A million bucks, a couple million buck, give or take, maybe

 3    a little less, maybe a little more.

 4    Q.   Did you show up with a million dollar check to Tony's Deli?

 5    A.   No.  We would show up with cashier's checks in different

 6    people's names under $25,000.

 7    Q.   And when you say different people's names, was Mr. Goyos

 8    one of those people?

 9    A.   Yes, he was.

10    Q.   How many people helped you do this?

11    A.   Um-m-m, I mean, at one time we would bring about ten

12    people, you know, ten to 15 people, 20 people.

13    Q.   Was Mr. Macier one of them?

14    A.   Yes, he was.

15    Q.   Mr. Macier did this for you a handful of times, didn't he?

16    A.   Yes, basically every time.

17    Q.   Did Mr. Goyos do this for you?

18    A.   Yes, he did.

19    Q.   Do you recall how many times?

20    A.   It was a few times.

21    Q.   Now, why are the denominations just under $25,000?

22    A.   We were advised by the check cashing store that it had to

23    be under $25,000 so he could cash that check and get paid by

24    his bank and he didn't have to sit on that cashier's check for

25    two or three days before the bank paid him.  I guess that
```

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 129 of
180

1    $25,000 is that sweet number, that cap.

2    Q.  What was the arrangement you had with Jose Goyos and the

3    others who did this for you?  How did it actually play out?

4    A.  It would be a Friday afternoon, I would either walk up to

5    them, text them, call them, and say, hey, do you want to cash a

6    check?  They'd say yes.  I'd go to the bank and get ten

7    cashier's checks under 25 grand, like 24,000 and random numbers

8    after.  We would then go meet at Tony's Deli in Delray Beach.

9    The employees would take those checks, go and cash them with

10   Tony one by one.  They would get the cash in a brown paper and

11   go put it in the trunk of my car.

12   Q.  And Jose Goyos did this?

13   A.  Yes.  We paid those employees $500 every time they cashed a

14   check.

15   Q.  In at least one instance, did you pay Jose Goyos $500 to

16   cash one of those checks for you?

17   A.  Yes, I did.

18   Q.  Did that money come from the Cergena Laboratory's bank

19   account?

20   A.  Yes, it did.

21   Q.  Each and every dollar that went into the Cergena

22   Laboratory's bank account in October, November, where did that

23   money come from?

24   A.  Medicare.

25   Q.  Did Mr. Goyos also help you in another occasion to try to

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 130 of
180    130

```
 1    get a vehicle?
 2    A.  He did, yes.
 3    Q.  Now, describe what happened for the jury?
 4    A.  I was trying to get approved for a high end vehicle, and
 5    I -- obviously, when you are getting approved for a vehicle you
 6    need to have good credit and the finances to back it.  I had
 7    the finances to back it, I just didn't have the credit score.
 8    Jose had the credit score, so I was going to use his credit.
 9        I sent him over my bank statements, and he put them into
10    PDF filler or another program and basically put his name on my
11    bank statements.
12    Q.  I would like to show you what has been marked for
13    identification as Government Exhibits 1435 and 1435-A.
14        With regard to 1435, Mr. Carver, do you see that document?
15    A.  Yes, I do.
16    Q.  Do you recognize it?
17    A.  I do.
18    Q.  What do you recognize it to be?
19    A.  It is an email.
20    Q.  Who is it from?
21    A.  Jose Goyos to myself.
22    Q.  What is the date?
23    A.  January 20, 2021.
24    Q.  And what is the subject?
25    A.  Bank statements.
```

Pauline A. Stipes, Official Federal Reporter

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 131 of
180

1    *Q.*  **And is there an attachment?**

2    *A.*  **Yes, there is a pdf.**

3    *Q.*  **Looking at 1435-A, do you recognize that document?**

4    *A.*  **I do.**

5    *Q.*  **What do you recognize it to be?**

6    *A.*  **It is my bank statements from TD Bank.**

7    *Q.*  **Now, you say it is your bank statements.  I would like to**

8    **show you also what has been marked for identification as 1435**

9    **B, as in boy.  I am sorry, 1436-B.  My apologies.**

10       **Do you recognize this document?**

11   *A.*  **Yes.**

12   *Q.*  **What is it?**

13   *A.*  **It is the same document.**

14   *Q.*  **What account -- on 1436-B, what account is this for?**

15   *A.*  **MDA Consumers, Inc.**

16   *Q.*  **And what month is this a bank statement for?**

17   *A.*  **November.**

18   *Q.*  **What year?**

19   *A.*  **2020.**

20       *MR. QUEENAN:*  **Your Honor, at this point the Government**

21   **moves to admit 1435A, 14 -- I am sorry, 1435-A and 1436-B.**

22       *THE COURT:*  **You need to please restate those.**

23       *MR. QUEENAN:*  **I apologize, your Honor.  1435, 1435-A,**

24   **and 1436-B.**

25       *THE COURT:*  **Any objection to those exhibits?**

**Pauline A. Stipes, Official Federal Reporter**

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
97 of 104
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 132 of 132
180

1          MS. McCRAE:  We maintain the previous objection, your

2     Honor.

3          THE COURT:  Pursuant to the Court's ruling issued

4     September 28th, these objections are overruled and these three

5     exhibits are admitted over Defendant's objection.

6        (Whereupon Government Exhibits 1435, 1435-A, 1436-B were

7     marked for evidence.)

8          MR. QUEENAN:  Thank you, your Honor.  Before I publish

9     those, I want to review two other documents.  Can we pull up

10    1436-A and 1435-B.

11          Just one moment.

12    BY MR. QUEENAN:

13    Q.  Now, I want to focus on 1436-A for a minute.  Do you

14    recognize that document?

15    A.  Yes, I do.

16    Q.  What is 1436-A?

17    A.  My bank statement for MDA Consumers, Inc.

18    Q.  For December 2020?

19    A.  Yes.

20    Q.  Do you see 1435-B?

21    A.  Yes, I do.

22    Q.  Do you recognize that?

23    A.  I do.

24          MR. QUEENAN:  Your Honor, we move to admit 1436-A, and

25    1435-B.

**Pauline A. Stipes, Official Federal Reporter**

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 133 of
180

1          MS. McCRAE:  Same position, your Honor.

2          THE COURT:  Same ruling.  1435-B and 1436-A are

3     admitted over objection.

4          (Whereupon Government Exhibits 1435-B, 1436-A were marked

5     for evidence.)

6          MR. QUEENAN:  Can we publish for the jury 1435 and

7     1435-B.  If you can zoom in on the bank statement section of

8     that email.

9     BY MR. QUEENAN:

10    Q.  Mr. Carver, the jury can now see this.  Can you walk them

11    through what we reviewed before?

12    A.  It's an email from Jose Goyos to myself on January 20,

13    2021.  The subject is bank statements and the attachment has a

14    pdf statement of I believe the bank statements.

15    Q.  Does it have two pdf statements, one for November and one

16    for December?

17    A.  Yes.

18    Q.  This is Mr. Goyos sending these to you on January 20th?

19    A.  Yes.

20    Q.  Can we pull up 1435-B.  Is this the December statement that

21    is attached to this email?

22    A.  Yes.

23    Q.  Okay.  Could you zoom in on the whole top section, please.

24        What company are these bank statements for?

25    A.  The one you are showing me?

**Pauline A. Stipes, Official Federal Reporter**

```
 1    Q.   Yes.

 2    A.   Jose Goyos, Inc.

 3    Q.   Is that a real company?

 4    A.   No, it is not.

 5    Q.   What is that then?

 6    A.   I believe it is a fake company that he created on the fly

 7    so he could make it look like those were his bank statements.

 8    Q.   What bank statements did he use to make this bank statement

 9    with that fake company?

10    A.   My bank statements.

11    Q.   Could you show side by side 1436-A and 1435-B.  I am sorry,

12    1436-A.

13         Okay.  What are we looking at on the left, 1436-A?

14    A.   The real bank statements, my company's bank statements.

15    Q.   So, is the content of the bank statements the same?  All

16    this money coming in, looks like deposits, balance of 559,000,

17    is all of that the same?

18    A.   It is.

19    Q.   What is changed?

20    A.   Just the name.

21    Q.   And describe for the jury, why did you change this into

22    Jose Goyos, Inc. with Mr. Goyos?

23    A.   We were trying to, I guess you could say trick the car

24    company to think that it was Jose's bank statements, his

25    company bank statements, and not mine.
```

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL    Document 994 100 of 104 on FLSD Docket 01/27/2024    Page 135 of 135
180

```
 1   Q.  Now, the money in the MDA Consumers account in November and

 2   December 2020, where did that money come from?

 3   A.  Medicare.

 4   Q.  How did it get there?  Medicare paid who?

 5   A.  Medicare paid the laboratory, the laboratory paid Broad

 6   Street first, and then they paid me, or I paid myself.

 7   Q.  Did you submit this to the bank?

 8   A.  What do you mean?

 9   Q.  Did you and Jose Goyos go try to get that car and use these

10   bank statements?

11   A.  Yes, we did.

12   Q.  I would like to show you what has been marked for

13   identification as Government Exhibit 1010.

14       Now, did you communicate with Jose Goyos during this time

15   by cell phone?

16   A.  I did, yes.

17   Q.  On July 14th, did the Government execute a search warrant

18   to seize your cell phone?

19   A.  It did, yes.

20   Q.  Did that cell phone contain a text thread between you and

21   Jose Goyos?

22   A.  Yes, it did.

23   Q.  Did this text thread include a communication with regard to

24   these bank statements?

25   A.  Yes, it did.
```

Case No. 1:24-cr-00251-RMR   Document 93-4   filed 09/27/24   USDC Colorado   pg
Case 9:22-cr-80022-DSL   Document 994   Entered on FLSD Docket 01/27/2024   Page 136 of 136
180

```
 1              MR. QUEENAN:  Your Honor, I move to admit Government
 2     Exhibit 1010, pages 7 through 13.
 3              THE COURT:  Any objection?
 4              MS. McCRAE:  Can I have just a moment, your Honor?
 5              THE COURT:  Yes.
 6              MS. McCRAE:  Same objection, your Honor.
 7              THE COURT:  I don't know what you mean by same
 8     objection.
 9              MS. McCRAE:  May we approach sidebar?
10              THE COURT:  Okay.  Are you referring to the same
11     objection with respect to the 1435 series?  You can go back to
12     a mike.
13              MS. McCRAE:  Yes, that is correct, your Honor.
14              THE COURT:  Okay.  So, for the same reasons previously
15     ruled yesterday, pages 7 through 13 of Government's 1010 are
16     admitted over Defendant's objection.
17          (Whereupon Government Exhibit 1010 was marked for
18     evidence.)
19              MR. QUEENAN:  Thank you, your Honor.
20     BY MR. QUEENAN:
21     Q.  Okay.  I would like to publish to the jury, please, and if
22     we can draw your attention to the bubble on the bottom here.
23          Who is this text from?
24     A.  Jose Goyos to myself.
25     Q.  And what is the date?
```

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994 10 af e04d on FLSD Docket 01/27/2024   Page 137 of 137
180

```
 1   A.  It is --

 2   Q.  Down at the bottom there.

 3   A.  1/6/2021.

 4   Q.  What is Mr. Goyos saying to you?

 5   A.  "Okay.  The problem I am going to have is income."

 6   Q.  What is he referring to?

 7   A.  For getting the car approved in his name.

 8   Q.  At this point, have you already talked to him about what

 9   you guys were going to do?

10   A.  Yes, we talked over the phone or face time.

11   Q.  Could you please roll the thread.

12       Mr. Goyos, what does he say next?

13   A.  "Call me when you have a second."

14   Q.  The same day?

15   A.  Yes.

16   Q.  Did you guys discuss this further?

17   A.  Yes, we did.

18   Q.  Continue, please.

19       What do you say?

20   A.  "Done".

21   Q.  What does that mean?

22   A.  That I either sent him the email or sent him something.  I

23   believe it was the email.

24   Q.  Keep rolling.

25       Mr. Goyos says thank you?
```

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994 Entered on FLSD Docket 01/27/2024   Page 138 of 138
180

1    A.    Yes.

2    Q.    And then you say to him --

3    A.    "Send me a picture of your license, please."

4    Q.    Why did you need his license?

5    A.    To give it to the finance manager at the dealership.

6    Q.    Keep rolling.

7          Does Mr. Goyos send you a picture of his license?

8    A.    He does.

9    Q.    Front and back?

10   A.    Yes, sir.

11   Q.    Now, this is a few days before then, though, this is

12   January 7, 2021.  Was this an ongoing process?

13   A.    Yes, it was the next day, I believe.

14   Q.    Well, I can re-orient you back to the bank statements and

15   the email you got from Mr. Goyos, but that is later in the

16   month of January.

17   A.    What do you mean?

18   Q.    Meaning did this process take a few weeks for you to go

19   back and forth with the car dealership?

20   A.    Yeah, yeah.  Yes, it wasn't just a one day thing.

21   Q.    A couple days later Mr. Goyos says, "Whatever happened with

22   the whip."  How did you interpret that?

23   A.    Did we get approved or not.

24   Q.    What does he say here?

25   A.    "P.s. like they pulled my credit again."  They kept

Case No. 1:24-cr-00251-RMR    Document 93-4    filed 09/27/24    USDC Colorado    pg
Case 9:22-cr-80022-DSL   Document 994 10f 104red on FLSD Docket 01/27/2024   Page 139 of 139
180

```
 1    checking his credit.
 2    Q.  Now, this is before you guys changed the bank statements,
 3    right?
 4    A.  Yes.
 5    Q.  What do you say?
 6    A.  "Jesus".
 7    Q.  What does he say?
 8    A.  "Yeah, that is weird, right?"
 9    Q.  Keep going.
10    A.  "It lowered my score five points.  Yes, he did hit on her."
11    Q.  Separate conversation?
12    A.  I believe so.
13    Q.  Now, what does Mr. Goyos say here?
14    A.  "I have an idea and bank statements.  Give me a call when
15    you get a chance."
16    Q.  What was the idea?
17    A.  That he was going to change the statements to his company
18    name.
19    Q.  And this was all to help you buy a car?
20    A.  Yes.
21          MR. QUEENAN:  Your Honor, the only line of questioning
22    I have left relates to one more topic.
23          THE COURT:  Okay, all right.  Let's see what time it
24    is.  It is 4:45.  Ladies and gentlemen, I have a few additional
25    matters to discuss with the attorneys, and given all the storms
```

Pauline A. Stipes, Official Federal Reporter